In the Matter of WILLIAM F. BUCKLEY, JR., as Editor of NATIONAL REVIEW, et al., Petitioners, *v.* JOHN J. MENG, as President of Hunter College of the City of New York, et al., Respondents.

Supreme Court, Special Term, New York County, June 25, 1962.

*Vladeck & Elias* for petitioners. *Leo A. Larkin, Corporation Counsel,* for respondents.

JACOB MARKOWITZ, J. " [C]ourage [is] the secret of liberty " (*Whitney* v. *California,* 274 U. S. 357, 375, concurring opinion of BRANDEIS, J.) and, therefore, timidity on the part of its officials

in the face of heretical or controversial ideas cannot be tolerated in a democratic society. When such timidity is embodied in an official regulation governing the use of school buildings, it must be struck down as violative of the First Amendment to our Federal Constitution.

The issue before me arises out of the refusal by the administrative committee of Hunter College — one of the municipal colleges established by the Board of Higher Education of the City of New York — to lease to petitioners, the editor and the publisher of the *National Review,* a journal of conservative opinion, the Hunter College auditorium for the purpose of conducting a series of forums. Since 1954, the *National Review* and *The Alliance,* a predecessor conservative organization, had sponsored an annual series of lectures or forums and leased the Hunter College auditorium for that purpose. In January, 1961, however, the *National Review* was advised by the dean of administration of Hunter College that the college would no longer lease its premises to the *Review.*

The circumstances under which the *Review's* long-standing lease arrangement was terminated are of some significance and they are set forth in the pleadings without dispute. On December 1, 1960, the *Review* had sponsored a lecture by Jacques Soustelle, one of the leaders of the French rightist movement aimed at keeping Algeria French. Evidently, the meeting had aroused great controversy and it had been picketed. The very next day, the dean of administration wrote the editor of the *Review* requesting a copy of his introductory remarks at the Soustelle meeting. It was after he had received a copy of the introductory remarks that the dean wrote the letter to the *Review* telling them that they could no longer lease the Hunter auditorium.

In this letter of January 12, 1961, the dean explained the basis of his action by saying that, as a result of reading the introductory remarks of the editor, he had formed the opinion that the *Review* was clearly " a political group presenting a distinct point of view of its own " and that the college was " enjoined from allowing the Assembly and the Playhouse to serve as a forum for such political groups ". And he added, as if to indicate that this fact was plainly determinative of the matter, " picketing went on at the Soustelle meeting ".

In April of 1961, after the matter had been brought to the attention of the president of Hunter College, he addressed a letter to the editor of the *Review* in which he said that " these halls are not available for political or other public movements or groups in presenting a distinct position or point of view

opposed by substantial parts of the public ''. The president also added that the rationale of the policy was that '' academic institutions of a public character must avoid giving the appearance or creating the suspicion that they favor particular movements or groups over other groups opposed to their positions or their points of view ''.

It should be noted that the statements of policy expressed by the administrative dean and the president did not refer to any pre-existing regulations governing the use of Hunter College's facilities. They were more in the nature of expressions of personal views than implementations of existing regulations. In fact, it was not until June, 1961 that the administrative committee of the college promulgated the set of '' Policies Governing Use of Hunter College Facilities '' which the college relies upon in this proceeding.

Turning now to this statement of policy, it provides that the college facilities are '' primarily for academic use ''. It then goes on to specify permissible nonacademic uses. In the first category of nonacademic uses are student extracurricular activities; in the second, activities of professional or academic organizations; in the third, educational conferences; finally, the fourth and last category is set forth, as follows: '' Other programs offered by outside organizations insofar as these are determined to be compatible with the aims of Hunter College as a public institution of higher learning. This criterion is not met, for example, by organizations whose meetings have caused disturbances; whose presence would tend to impair the good name or the academic prestige of the College; or whose character would give reasonable grounds for the assumption that the College favors particular groups or movements having a distinct point of view or position over other groups or movements opposed to their point of view or position.''

In this article 78 proceeding, the editor and the publisher of the *National Review* challenge both the validity and the application of the regulations which have denied them the right to use Hunter College's auditorium. The petitioners contend that, although there is no duty to make public schools available for nonacademic uses, once having made them available, the regulations governing the use must meet constitutional standards, in particular, the standards of the First Amendment. To this the respondents answer by asserting that, as long as the regulations '' do not discriminate against a prospective tenant by refusing him while renting to others in the same category for the same use '', there is no constitutional infirmity and the regulations must be upheld.

It is plain, then, that both parties agree that the duly constituted school authorities may regulate the nonacademic use of school facilities. The only issue remaining, therefore, is whether the regulations concerned are reasonable and within the bounds of constitutional propriety. In my view, the Hunter College regulations are either so vague as to invite discriminatory and arbitrary regulations, or else must be taken to rest upon a classification of uses which has no place in a democratic society because it stifles rather than stimulates the free discussion of vital public issues.

Freedom of speech is " basic to a free and dynamic society (*Brown* v. *Kingsley Books,* 1 N Y 2d 177, 181, affd. 354 U. S. 436) ; some have even suggested that freedom of speech has a " preferred position " in the constellation of constitutional rights (*Kovacs* v. *Cooper,* 336 U. S. 77, 88). It is in the light of the paramount value of free expression that the courts have drawn the corollary rule that any limitations on such expression must be drawn with precision (see, e.g., *Thomas* v. *Collins,* 323 U. S. 516, 530; *Winters* v. *New York,* 333 U. S. 507, 509; *Niemotko* v. *Maryland,* 340 U. S. 268, 271–272; *Feiner* v. *New York,* 340 U. S. 315, 319; *Butler* v. *Michigan,* 352 U. S. 380, 382; *Brown* v. *Kingsley Books,* 1 N Y 2d 177, 181, *supra*). The reason for the requirement of clarity may be stated simply: we value speech so highly, that we will only enforce a restriction on speech which is not subject to expansion at the discretionary whim of one who applies it. We will not tolerate " dubious intrusions " (*Thomas* v. *Collins,* 323 U. S. 516, 530, *supra*) which arise out of vagueness in the standards which restrict this valued right.

It is true, of course, that many of the cases in which restrictions on free speech have been struck down on the ground of vagueness have involved criminal statutes. Thus, for instance, *Winters* v. *New York* (333 U. S. 507, *supra*), a leading case in the area, concerned the validity of a statute making it a crime to possess with the intent to sell obscene prints and articles. *Butler* v. *Michigan* (352 U. S. 380, *supra*) involved an ordinance making it criminal to make available or to introduce into any family books having a potentially deleterious effect on youth.

But the same principle has been applied where the exercise of free expression has been subject to administrative regulation in the form of a licensing requirement. In such circumstances, the Supreme Court has indicated that the licensing requirement will stand only where it has a proper purpose and where the standards governing the issuance of the license are so clear as to obviate arbitrary and discriminatory action (see, e.g., *Hague* v. *Committee for Ind. Organization,* 307 U. S. 496, 516; *Schneider*

*v. State* [*Town of Irvington*], 308 U. S. 147, 157–159, 163–165; *Cox* v. *New Hampshire,* 312 U. S. 569, 574; *National Broadcasting Co.* v. *United States,* 319 U. S. 190, 225–226; *Saia* v. *New York,* 334 U. S. 558, 560; *Niemotko* v. *Maryland,* 340 U. S. 268, 271–272, *supra*). The court has made it clear, in these cases, that the danger to be avoided is that lack of precision in the standard which restricts speech, and thus invites unnecessary expansion, limitation or wrongful discrimination on the part of those called upon to apply it.

Turning now to the standard by which Hunter College proposes to determine who shall use its facilities, I find that it partakes of that quality of indefiniteness which renders it offensive to First Amendment principles.[1] As I have already indicated, the regulation concerned provides that " Other programs [using Hunter College's facilities may be] offered by outside organizations insofar as these are determined to be compatible with the aims of Hunter College as a public institution of higher learning ". This is not a standard of such clarity that one who reads it can know whether a given use falls within it or without.

In the first place, the regulation bespeaks its own indefiniteness by reason of the fact that it expressly provides that in order to qualify, a program must be " *determined to be compatible* with the aims of Hunter College ". Thus, a decision as to whether a program is permissible depends on a determination outside the scope and terms of the regulation. Who is empowered to make such a determination? And by what standards? In effect, whether a program is permissible or not rests on the untrammelled discretion of some official.

In the second place, even if we neglect this imperfection, and read the regulation as providing that " other programs " are permissible if they are " compatible with the aims of Hunter College as a public institution of higher learning ", we are left to bare speculation and surmise in deciding whether a use is permissible or not. Search my mind as I will, I cannot state with any precision what the aims of Hunter College are. Furthermore, I have grave doubt that any two professors or administrators could agree on a precise definition of such aims.

I would have thought, for instance, that one of the aims of a college worthy of the name was to stimulate thought and to provoke intellectual controversy. The action of the dean of administration and the president of Hunter in this case bespeaks

---

1. I shall neglect, for the purpose of this adjudication, the fact that the regulation upon which Hunter College relies for its denial of a lease to the *National Review* was promulgated after the decision to deny the application was made.

a contrary belief — they seem to regard intellectual quiescence and freedom from any conceivable identification with strongly expressed views as being necessary to their educational goals. I do not, of course, judicially deny them the right to determine the aims of their college. I do judicially hold, however, that consistency with the aims of the college is not a sufficiently clear standard by which to determine who shall use the college's facilities because reasonable men can and do differ as to what these aims are. As long as it is possible for reasonable men to differ as to what a given standard means, that standard cannot properly serve as a basis for a limitation on First Amendment rights.

The vice of vagueness in these matters is perfectly illustrated in the case at hand. For here, evidently, the college administration has found that a celebration of independence of new African nations and a commemoration of the political uprisings in Hungary, for example — which two programs were both sanctioned — were permissible uses because consistent with the aims of the college. But they found that a program in which Jacques Soustelle attacked French policy on Algeria fell outside the permissible uses and was inconsistent with the aims of the college. All three programs seem to have had a political content and all three seem to have taken a firm stand in favor of one or another political position. And yet two of them were found permissible, the third not.

What makes a distinction between one or another of these three programs at all plausible is the very vagueness of the applicable standard. The administrator, whether consciously or not, has substituted his own bias and predilection for the letter of the standard. And he has been able to do this because the standard itself does not supply him with sufficient criteria for decision; the administrator has filled a decisional vacuum, so to speak. Whatever the effect of the substitution of personal judgment and discretion for the letter of the law may be in other instances, it is intolerable when hallowed First Amendment rights are at stake.

The college authorities seem to argue, however, that there is a real distinction between Soustelle lecturing on a French Algeria and the celebration of Hungarian political uprisings. And they seem to believe that this distinction is embodied in the statement of " Policies Governing Use of Hunter College Facilities " and that it saves it from unconstitutional vagueness. The portion of the statement of policy referred to is that which provides that the criteria for use of the college's facilities are not met by organizations " whose character would give reasonable grounds for the assumption that the college favors par-

ticular groups or movements having a distinct point of view or position over other groups or movements opposed to their point of view or position ".

Now, it is not at all clear to me exactly what this statement means and were I to have no other guide to what was intended to be prohibited than these words I would find them, like the positive criteria for use of the facilities discussed above, unconstitutionally vague, I am constrained to believe, however, that what is intended by this language is a thought expressed in one of the letters the president of Hunter wrote to the editor of the *Review* — a thought also expressed in the college's brief in this court. What is intended is that the college avoid scheduling unpopular or controversial lectures or forums. Thus, in the letter the president wrote to one of the petitioners in April, 1961, he said that " these halls are not available for political or other public movements or groups in presenting a distinct position or point of view opposed by substantial parts of the public ". In respondents' brief is found the assertion that an organization " may not use these facilities for conducting controversial discussions ". Similar expressions are found at other points in the correspondence between the parties and in other exhibits before me.

If I am correct in supposing that one of the criteria for the use of Hunter College's facilities is whether or not the proposed program presents a popular, noncontroversial point of view — one which is not " opposed by substantial parts of the public ", to quote the president's words — it would follow that the standard for the use of the facilities is indeed clear. It would also follow, however, that this clear standard is itself unconstitutional because it discriminates against the expression of unpopular, minority opinion.

It should be stated at once that the college officials are not so crass as to reject minority viewpoints because of their content; they would prevent minorities of the right as well as of the left from expounding their views in the college halls. Their motives are rather to avoid identification with any minority position and to avoid picketing and other such " disturbances " — the quotation is from the college's statement of policy — which sometimes attend, as they did in the Soustelle meeting, the public meetings of dissident groups. To my mind, as well-intentioned as these aims are, they evidence a temper of mind alien to the spirit of liberty and incompatible with the philosophy of the First Amendment.

In his essay " On Liberty ", John Stuart Mill stated in words which will ring true as long as democracy remains a vibrant

form of government the value of the voice of dissent. He said: " the peculiar evil of silencing the expression of opinion is that it is robbing the human race; posterity as well as the existing generation; those who dissent from the opinion still more than those who hold it. If the opinion is right, they are deprived of the opportunity of exchanging error for truth: if wrong, they lose what is almost as great a benefit, the clearer perception and livelier impression of truth, produced by its collision with error ". And he added, at a later point in the essay, the thought that: " if there are any persons who contest a received opinion, or will do so if law or opinion will let them, let us thank them for it, open our minds to listen to them, and rejoice that there is some one to do for us what we otherwise ought, if we have any regard for either the certainty or the vitality of our convictions, to do with much greater labor for ourselves ".

Whosoever cherishes liberty and dissent as Mill did must be prepared to pay its price. And that price includes suffering the clamor and disturbance, the elevated emotions and postures of defiance, which are generated by giving the voice of dissent free rein. Whenever men disagree, and especially when they disagree about issues which are dear to them, there is the danger that the opposition may pass from the realm of ideas to the realm of action. Unless we are prepared to foreswear the values attendant upon the free expression of ideas, we must sacrifice that sense of security and quietude which would attend unanimous belief.

Our dedication as a nation to this philosophy has, of course, been expressed with eloquence and force in courts of law as well as in many other forums of opinion. Nowhere, in my view, has it been more eloquently and forcefully expounded than in the concurring opinion of Justice BRANDEIS, in which Justice HOLMES joined, in the case of *Whitney* v. *California* (274 U. S. 357, 375, *supra*): " Those who won our independence believed that the final end of the State was to make men free to develop their faculties; and that in its government the deliberative forces should prevail over the arbitrary. They valued liberty both as an end and as a means. They believed liberty to be the secret of happiness and courage to be the secret of liberty. They believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; that without free speech and assembly discussion would be futile; that with them, discussion affords ordinarily adequate protection against the dissemination of noxious doctrine; that the greatest menace to freedom is an inert people;

that public discussion is a political duty; and that this should be a fundamental principle of American government ".

The Hunter College administration will answer, of course, that these pronouncements are misdirected when directed at them; that they have the same dedication to liberty that is here expressed; that they are not trying to stifle opinion but only to protect the good name of the college; that the use of school buildings is a privilege and not a right and that, therefore, it may be limited; and, finally, that they do not deny the *National Review* the opportunity to express its views, they only deny them the right to do so in a school building.

Let me make it clear immediately that I have no doubt that the Hunter College administration is motivated by good intentions and that they hold as steadfastly as any of us do to the fundamental principles of free speech. I am persuaded, however, that they are in error in their application of these principles to the facts of this case.

The overriding issue as to use of school facilities for non-academic purposes is not raised. Thus, while there may be no duty to open the doors of the school houses for uses other than academic — and I have some doubt even as to this proposition — once they are opened they must be opened under conditions consistent with constitutional principle (see, e.g., *First Unitarian Church* v. *Los Angeles,* 357 U. S. 545, 546; *Speiser* v. *Randall,* 357 U. S. 513, 518; *Danskin* v. *San Diego Unified School Dist.,* 28 Cal. 2d 536, 545–546; *Chicago Housing Auth.* v. *Blackman,* 4 Ill. 2d 319, 321; *Kutcher* v. *Housing Auth. of City of Newark,* 20 N. J. 181, 184; *Lawson* v. *Housing Auth. of City of Milwaukee,* 270 Wis. 269, cert. denied 350 U. S. 882; *Rudder* v. *United States,* 226 F. 2d 51, 53). As the Supreme Court of California expressed it in the *Danskin* case, very similar to this: " The state is under no duty to make school buildings available for public meetings. \* \* \* If it elects to do so, however, it cannot arbitrarily prevent any members of the public from holding such meetings [nor] \* \* \* make the privilege of holding them dependent on conditions that would deprive any members of the public of their constitutional rights. A state is without power to impose an unconstitutional requirement as a condition for granting a privilege even though the privilege is the use of state property " (28 Cal. 2d 536, 545–546).

The principle of these cases is the simple one that what the State cannot do directly it may not do indirectly. Since there is no power in the State to stifle minority opinion directly by forbidding its expression, it may not accomplish this same pur-

pose by allowing its facilities to be used by proponents of majority opinion while denying them to dissenters. The Supreme Court declared in *Kingsley Int. Pictures Corp.* v. *Regents of the Univ. of the State of N. Y.* (360 U. S. 684, 689) that the guarantee of the First Amendment " is not confined to the expression of ideas that are conventional or shared by a majority ". This being so, Hunter College may not forbid its facilities — to quote again the words of its president — to " groups * * * presenting a distinct position or point of view opposed by substantial parts of the public ".

To be sure, the Hunter College authorities are motivated by the desire to preserve the good name of their college, rather than by a desire to stifle minority opinion. But even if I were to suppose that they are correct in believing that to allow dissenting opinion to be expressed from their platforms has a tendency to besmirch the institution — and I, in fact, think they are wrong in this — this would not provide a sufficient reason to deny the expression of the opinion. To quote again from Justice BRANDEIS in the *Whitney* case (274 U. S. 357, 377, *supra*) — and it is a view, of course, which has been stated by the Supreme Court on so many occasions that it is superfluous to even cite them — " Only an emergency can justify repression ".

The danger of our times is not that we as a people have become aroused to fever pitch by the excitement of ideas. It is rather the opposite, that we as a people have become inert and conformist, that we do not often enough hear the vital issues of our day mooted from public platforms. The danger is that our principles will lose — to quote Mill — " the clearer perception and livelier impression * * * produced by [their] collision with error " or that we will be " deprived of the opportunity of exchanging error for truth ".

These being the dangers of our day a college should, to my mind, pursue a policy of fostering discussion and the exchange of opinion by providing an open forum for it to all who want to be heard. A college should generate intellectual excitement, it should attempt to awaken the public mind from the torpor and quiescence of accepted and conventional opinion.

This court cannot, of course, impose such a policy on officials who are themselves empowered under law to formulate the policy of their educational institution. This court can and must, however, forbid Hunter College from denying discussion of public issues from its halls on the ground that it is the voice of a minority or the voice of one not approved by an official acting under the present regulations. The current regulations governing the use of Hunter College's facilities are either unconsti-

tutionally vague or else they embody unconstitutional principle of selection. In either case, they must be struck down and the administrative committee of the college must with all due speed enact a new set of regulations consistent with the foregoing, under which the petitioners may once again apply for a lease of Hunter College's facilities.