[S. F. No. 22418. In Bank. Dec. 21, 1967.]

FRANCES WIRTA et al., Plaintiffs and Respondents, v. ALAMEDA-CONTRA COSTA TRANSIT DISTRICT et al., Defendants and Appellants.

Robert E. Nisbet, Heller, Ehrman, White & McAuliffe, Caspar W. Weinberger and M. Laurence Popofsky for Defendants and Appellants.

Joseph R. Grodin and Marshall W. Krause for Plaintiffs and Respondents.

MOSK, J.—We are called upon to decide whether a transit district, formed under the provisions of section 24501 et seq. of the Public Utilities Code, may constitutionally restrict the paid advertising on its motor coaches to commercial solicitation for the sale of goods and services and to issues and candidates on the ballot at the time of an election.

Plaintiffs are officers of an organization called Women for Peace, an unincorporated association operated for the purpose

of promoting the cause of world peace through education, and to urge citizens to express their views on peace to public officials. Defendants are the Alameda-Contra Costa Transit District (hereinafter called the district) and Metro Transit Advertising, a California corporation (hereinafter called Metro). The district operates motor coaches for the transportation of passengers within Alameda and Contra Costa Counties and from those counties to San Francisco. The coaches contain space for advertising above the passengers' seats and, in order to facilitate the sale of this space to advertisers, the district entered into an agreement with Metro, under which the latter leases the space from the district and re-leases it to others. The agreement provides that political advertisements and advertisements on controversial subjects are not acceptable unless approved by the district, and that advertising objectionable to the district shall be removed by Metro.

On or about September 10, 1965, Women for Peace requested that it be allowed to place an advertisement on defendants' coaches, at the standard rate charged. The message read:

" 'Mankind must put an end to war or war will put an end to mankind.'

President John F. Kennedy.

Write to President Johnson: Negotiate Vietnam.

Women for Peace

P. O. Box 944, Berkeley."

Defendants refused to accept the advertisement on the ground that it conflicted with the district's advertising policy with regard to paid advertisements: "The . . . District . . . accepts only commercial advertising for the sale of goods and services, except that political advertising will be accepted in connection with and at the time of a duly called election being held within the boundaries of the District, and further subject to the conditions that (a) each advertisement bear an approved disclaimer and an indication that the advertisement was placed by an advertising agency, and (b) space be made equally available to opposing candidates or sides of a ballot measure." Pursuant to this policy, Metro endeavors to contact opposing candidates and identifiable groups supporting the conflicting viewpoints of any ballot issue in order to

apprise them of their opportunity to secure equal space for presenting their views.

Plaintiffs brought this action,[1] alleging that defendants' refusal to accept the advertisement was an unconstitutional abridgement of their right of free speech and that the exclusion of advertisements not connected with a political campaign constituted a denial of equal protection of the laws. (U.S. Const., First and Fourteenth Amendments; Cal. Const., art. I, § 9.) They prayed for an injunction restraining defendants from refusing to accept the advertisement. The trial court found that defendants' conduct was unreasonable, discriminatory and without just or sufficient cause, unconstitutionally abridged plaintiffs' rights of free speech, and deprived them of equal protection. The court issued a preliminary injunction restraining defendants from refusing to accept the advertisement in question.

At the threshold we emphasize that the content of the advertisement in question is undeniably protected by the First Amendment. Since neither party urges the contrary, we need not labor the point. The fact that the message is proposed as a paid advertisement does not detract from the protection afforded. (*New York Times Co.* v. *Sullivan* (1963) 376 U.S. 254, 266 [11 L.Ed.2d 686, 698, 84 S.Ct. 710, 95 A.L.R.2d 1412].)

The second elementary factor we recognize is that the determination of the district to accept advertising on its motor coaches serves as its considered conclusion that this form of communication will not interfere with its primary function of providing transportation. Thus, we avoid the considerations applicable to ascertaining whether public property must be made available as a forum for the exercise of First Amendment rights. (See *In re Hoffman* (1967) 67 Cal.2d 845 [64 Cal.Rptr. 97, 434 P.2d 353].) Here that affirmative determination has been made by the district and is not questioned by the parties.[2]

---

[1]Plaintiffs are acting as individuals and as representatives of the Berkeley-Oakland Chapter of Women for Peace.

[2]In *Adderley* v. *Florida* (1966) 385 U.S. 39 [17 L.Ed.2d 149, 87 S.Ct. 242], cited by defendants, the trespass convictions of persons demonstrating on county jail property were upheld. The court relied on the facts that jails are built for security purposes and are not open to the public, that large groups of the public had not been permitted to gather on the portion of the jail grounds used by the demonstrators, and that a

Our problem, therefore, is reduced to a situation in which a governmental agency has refused to accept an advertisement expressing ideas admittedly protected by the First Amendment for display in a forum which the agency has deemed suitable for the expression of ideas through the medium of paid advertisements. This refusal is based on the ground that the agency's policy is to accept only advertisements for the sale of goods or services and certain types of political advertising at limited times. We conclude that defendants, having opened a forum for the expression of ideas by providing facilities for advertisements on its buses, cannot for reasons of administrative convenience decline to accept advertisements expressing opinions and beliefs within the ambit of First Amendment protection.

*Danskin* v. *San Diego Unified School Dist.* (1946) 28 Cal.2d 536 [171 P.2d 885], is directly in point. There a statute provided that the governing boards of school districts were required to grant access to the schools for meetings of organizations formed for educational, political, economic, and other stated purposes but prohibited the granting of the privilege to those who constitute a "subversive element," as that term was broadly defined in the statute.

This court held it unconstitutional for the state to prohibit certain persons or classified groups from exercising their rights of free speech and assembly at places where others were allowed to speak and assemble. The opinion stresses, "The state is under no duty to make school buildings available for public meetings. . . . If it elects to do so, however, it cannot arbitrarily prevent any members of the public from holding such meetings. . . . The convictions or affiliations of one who requests the use of a school building as a forum are of no more concern to the school administrators than to a superintendent of parks or streets if the forum is the green or the market place. . . . The very purpose of a forum is the interchange of ideas, and that purpose cannot be frustrated by a censorship that would label certain convictions and affiliations suspect, denying the privilege of assembly to those who hold them, but

state has power to preserve the property under its control for the use to which it was lawfully dedicated. Thus the court concluded that the state was not required to permit persons to exercise First Amendment rights on public property under certain circumstances. In the present case, as pointed out above, the district has determined that advertising in its buses will not interfere with its primary function of providing transportation.

granting it to those whose convictions and affiliations happen to be acceptable and in effect amplifying their privilege by making it a special one. . . . It is not for the state to control the influence of a public forum by censoring the ideas, the proponents, or the audience. . . . Those who are under the ban of the statute could not hold a meeting to pronounce their views with regard to pending legislation, constitutional amendments, election of political candidates, or even artistic or educational matters.''

Other recent cases have held that a public school may not deny the use of its facilities for public meetings because the applicant is a ''highly controversial figure'' (*East Meadow Community Concerts Assn.* v. *Board of Education* (1966) 272 N.Y.S.2d 341, 344-345) or because the proposed user would present views ''opposed by substantial parts of the public'' (*Buckley* v. *Meng* (Sup.Ct.N.Y. 1962) 35 Misc.2d 467 [230 N.Y.S.2d 924, 933-934]).

In the instant case, unlike *Danskin*, the ban is not upon the expression of ideas by persons or organizations whose convictions or affiliations are disapproved, but upon all ideas which do not relate to the sale of products or services or to an election. The prohibition here is painted with a much broader brush than that used by the school and condemned in *Danskin*. There all opinions and beliefs which fell within the protection of the First Amendment could be aired in the schools, and only their expression by purportedly subversive elements was barred, whereas here the ban is directly related to the content of the ideas sought to be published. Although the classification of ideas in the district's policy regulation is stated affirmatively in terms of the views which will be permitted to be the subjects of advertisements rather than those which are to be barred, and the regulation does not on its face indicate a preference for a particular point of view, the policy nonetheless violates plaintiffs' First Amendment rights. The vice is not that the district has preferred one point of view over another, but that it chooses between classes of ideas entitled to constitutional protection, sanctioning the expression of only those selected, and banning all others. Thus the district's regulation exercises a most pervasive form of censorship.

Not only does the district's policy prefer certain classes of protected ideas over others but it goes even further and affords total freedom of the forum to mercantile messages while banning the vast majority of opinions and beliefs extant

which enjoy First Amendment protection because of their noncommercialism. No statistical data is required to demonstrate that in the totality of man's communicable knowledge, that which bears no relationship to material value preponderates.

A long line of decisions has established the rule that commercial messages do not come within the orbit of the First Amendment and may be regulated or prohibited by the government in the same manner as other business affairs. (See *Freedom of Expression in a Commercial Context*, 78 Harv. L.Rev. 1191.) Thus, although a city may not prohibit public distribution of handbills expressing protected ideas (*Schneider* v. *State* [*Town of Irvington*] (1939) 308 U.S. 147, 162 [84 L.Ed. 155, 165, 60 S.Ct. 146]) it may ban commercial advertising in the form of handbills (*Valentine* v. *Chrestensen* (1942) 316 U.S. 52, 54 [86 L.Ed. 1262, 1265, 62 S.Ct. 920]). A distributor of notices for a religious meeting may not be barred from soliciting homeowners by an ordinance against the ringing of doorbells to distribute advertisements (*Martin* v. *City of Struthers* (1943) 319 U.S. 141, 146-149 [87 L.Ed. 1313, 1318-1320, 63 S.Ct. 862, 882]), but door-to-door solicitation for the sale of magazine subscriptions may be banned (*Breard* v. *City of Alexandria, La.* (1951) 341 U.S. 622, 641-645 [95 L.Ed. 1233, 1247-1249, 71 S.Ct. 920, 35 A.L.R.2d 335]). In the case at bar, the policy of the district reverses these acceptable priorities and perversely gives preference to commercial advertising over nonmercantile messages.

A minimum of imagination is required to illustrate the paradoxical scope of the district's policy. A cigarette company is permitted to advertise the desirability of smoking its brand, but a cancer society is not entitled to caution by advertisement that cigarette smoking is injurious to health. A theater may advertise a motion picture that portrays sex and violence, but the Legion for Decency has no right to post a message calling for clean films. A lumber company may advertise its wood products, but a conservation group cannot implore citizens to write to the President or Governor about protecting our natural resources. An oil refinery may advertise its products, but a citizens' organization cannot demand enforcement of existing air pollution statutes. An insurance company may announce its available policies, but a senior citizens' club cannot plead for legislation to improve our

social security program. The district would accept an advertisement from a television station that is commercially inspired, but would refuse a paid nonsolicitation message from a strictly educational television station. Advertisements for travel, foods, clothing, toiletries, automobiles, legal drugs —all these are acceptable, but the American Legion would not have the right to place a paid advertisement reading, "Support Our Boys in Viet Nam. Send Holiday Packages."

The foregoing prohibitions cannot be ascribed to whimsical or aberrant conduct of the district's management; they are the vices inexorably resulting from any deliberate effort to circumscribe First Amendment rights. Insistence of the district that it merely seeks to regulate freedom of speech as to time, place, and manner becomes unconvincing against the backdrop of examples of protected messages—including that involved in the case at bar—that the district deems acceptable at no time, no place, and in no manner, unless they should fortuitously coincide with an election issue.

A similar problem arose in *Cox* v. *Louisiana* (1965) 379 U.S. 536 [13 L.Ed.2d 471, 85 S.Ct. 453]. There a state statute prohibited the obstruction of public passageways but provided that it did not apply to picketing by a labor organization for the purpose of securing more favorable wages, hours, and working conditions. The appellant was convicted under the statute for leading a meeting on a sidewalk to protest racial segregation. The court reversed his conviction on the ground that the statute improperly permitted local officials to exercise unfettered discretion in regulating the use of the streets. In concurring, Justice Black stated that although he believed Louisiana could bar all picketing on its streets "if the streets of a town are open to some views, they must be open to all. . . . [B]y specifically permitting picketing for the publication of labor union views, Louisiana is attempting to pick and choose among the views it is willing to have discussed on its streets. It thus is trying to prescribe by law what matters of public interest people whom it allows to assemble on its streets may and may not discuss. This seems to me to be censorship in a most odious form, unconstitutional under the First and Fourteenth Amendments." (379 U.S. at pp. 580-581 [13 L.Ed.2d at pp. 501-502].)

 Defendants contend that plaintiffs' First Amendment rights are not abridged by the advertising policy in

issue because they are able to utilize the traditional means of expounding their beliefs through speeches and parades and because they can express the very ideas now proscribed if they relate the subject matter to a ballot proposal or carry the sponsorship of a named candidate for public office.

In the instant context these contentions are not persuasive. In creating an iron curtain barring expression of all ideas not related to an election or to the sale of goods or services, the regulation is comparable to the statute in *Cox* v. *Louisiana* (1965) *supra,* 379 U.S. 536, which banned issues unrelated to labor unions. The mere fact that plaintiffs would be permitted to advertise their message at the time of an election if they were able to secure the sponsorship of a candidate running for office or to conform it to an issue on the ballot only serves to illustrate the narrow permissiveness and the vast prohibitory scope of the regulation. Moreover, the insistence on identification of messages to the election process overlooks the propriety and value of political messages importuning executive, legislative, and administrative officials to adopt a desired course of conduct. That other forums for the expression of plaintiffs' ideas may be available is wholly irrelevant. (*Schneider* v. *State* [*Town of Irvington*] (1939) *supra,* 308 U.S. 147, 163 [84 L.Ed. 155, 165-166].)

Defendants insist, however, that the basic issue in the instant case is not the right of free speech, but the right to equal protection of the laws. They state that the equal protection clause is offended only if the classification rests on grounds wholly irrelevant to the achievement of a public objective, if no facts reasonably may be conceived to justify the classification assailed, and if the classification rests on no rational basis; they contend that the regulation here contains a reasonable classification. What defendants assert, in effect, is that they can prohibit the dissemination of certain types of ideas protected by the First Amendment if the classification they choose is arguably relevant to the objectives to be attained by the regulation and rests on some rational basis.

It is urged that there must be reasonable accommodation between the competing demands of freedom of speech and other significant interests of society which have some claims upon protection. Neither is absolute. Despite efforts of the district to articulate a rationale for its policy, if there is a societal interest, other than free speech, requiring protection

here, it is too obscure or trivial to be readily apparent. No valid conflict exists to compel a search for accommodation.

 The district maintains that its classification of permissible messages is reasonable. However, it is apparent that freedom of expression would rest upon a feeble foundation indeed if the district's standards were applicable to First Amendment rights, for *Danskin* (28 Cal.2d at p. 550) and numerous other cases have recognized that the general reasonableness test applicable to the due process and equal protection clauses is not to be utilized where First Amendment rights are at stake. (See, e.g., *Thomas* v. *Collins* (1945) 323 U.S. 516, 530 [89 L.Ed. 430, 440, 65 S.Ct. 315]; *Murdock* v. *Pennsylvania* (1943) 319 U.S. 105, 115 [87 L.Ed. 1292, 1299, 63 S.Ct. 870, 146 A.L.R. 81]; *Board of Education* v. *Barnette* (1943) 319 U.S. 624, 639 [87 L.Ed. 1628, 1638, 63 S.Ct. 1178, 147 A.L.R. 674]; *United States* v. *Miller* (1965) 249 F.Supp. 59, 63; *Weaver* v. *Jordan* (1966) 64 Cal.2d 235, 241 [49 Cal. Rptr. 537, 411 P.2d 289]; *Long* v. *City of Anaheim* (1967) 255 Cal.App.2d 191, 201 [63 Cal.Rptr. 56].)

It was pointed out by a majority of this court in *Weaver* v. *Jordan, supra,* 64 Cal.2d at pages 243-244, that where the restriction of a First Amendment right is of unlimited potential scope and the enactment is so broad as to impose a complete ban of expression and communication through a specified medium, only a clear and present danger that a serious substantive evil will result justifies the restriction. The medium of subscription television, as in *Weaver,* is comparable to advertising on motor coaches owned by a transit district which has determined that advertising is an appropriate means of expression in its buses. The restriction here, insofar as First Amendment rights are concerned, is almost complete, and defendants do not assert that any clear and present danger exists.

The theories advanced by defendants to justify their advertising policy are germane only to the problem of equal protection.[3] When the contentions in this regard are viewed in the context of the First Amendment the regulation appears clearly invalid.

---

[3] An exception to this is defendants' claim that the passengers on the buses are a "captive audience" and that if advertisements of the type submitted by plaintiffs were acceptable, persons riding in the buses would be subjected to political propaganda. There is no indication that passengers would find advertising on political and social issues more offensive than advertisements relating to commercial products and, in any

Defendants assert that the overriding consideration impelling them to adopt the present policy is the necessity to keep the Government outside the arena of partisan affairs and the acceptance of advertising unrelated to an election or the sale of goods and services might give the impression that the district endorses the views of the advertiser. Next, defendants contend that if they were compelled to display messages of the type offered by plaintiffs they would be required to accept all messages submitted to them, with the exception of those criminally proscribed. Finally, it is claimed that if noncommercial, nonelection advertising were accepted, it would be difficult for defendants to contact opposing groups to suggest that space would be available for the expression of their views. While these practical problems may be somewhat vexatious, they cannot be controlling. In the realm of the First Amendment, no governmental agency is permitted to burn down the house to roast a pig.

These pragmatic hurdles are no more relevant to a public forum when it is a motor coach than they are to a public park or a school auditorium. The endorsement of an opinion expressed in an advertisement on a motor coach is no more attributable to the transit district than the view of a speaker in a public park is to the city administration or the tenets of an organization using school property for meetings is to the local school board. Indeed, the district is more insulated from implied endorsement since it can, and in the instant case does, require a disclaimer in the text of the advertisements submitted to it.

Likewise, defendants' apprehensions relating to the content of the messages they would be required to accept are no more significant than those involved in permissible distribution of leaflets on the streets or the making of speeches in the parks and schools. In any event, the right to utilize a public forum for the expression of opinions and beliefs cannot be made to depend upon such ephemeral concerns.

It will undoubtedly be true, as defendants suggest, that an occasional advertiser may post controversial messages which

event, the district has apparently reached a contrary conclusion by determining that political advertising at the time of an election is acceptable. Furthermore, a passenger on a public conveyance does not possess the same rights of privacy as he does in his home; his rights are subject to reasonable limitations in relation to the rights of others. (*Public Utilities Com.* v. *Pollak* (1952) 343 U.S. 451, 464 [96 L.Ed. 1068, 1078, 72 S.Ct. 813].)

will offend some, perhaps a majority, in the community. Free speech inevitably encourages conflict and often rocks the boat. Phlegmatic indeed is the individual who at some time has not recoiled at the exercise of free speech by others. Annoyance and inconvenience, however, are a small price to pay for preservation of our most cherished right. Justice Douglas stated in *Terminiello* v. *Chicago* (1949) 337 U.S. 1, 4 [93 L.Ed. 1131, 1134, 69 S.Ct. 894], ". . . a function of free speech under our system of government is to invite dispute. . . . Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute . . . is nevertheless protected against censorship or punishment, unless likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest."

■ Defendants' potential problem of "equal time" for conflicting views is a straw man. No case or statute has been cited requiring a school board, if it permits an organization with one point of view to use its auditorium, to affirmatively solicit those with opposing views to air contra opinions. Nor is a city required to seek out speakers with differing viewpoints to use its streets and parks. While Metro's policy of contacting opposing sides in an election contest to offer advertising space is commendable, constitutional standards are satisfied if all those who wish to exercise their right to state beliefs and opinions protected by the First Amendment are permitted to do so on an equal basis.

■ It is to this requirement for nondiscriminatory treatment that the equal protection of the laws relates in the present context. Clearly, defendants may regulate the time, place, and manner of advertising to the extent necessary to accommodate those who wish to purchase advertising space, and such regulations are valid if they are applied without discrimination and without restriction as to lawful and protected content. (*Cox* v. *Louisiana* (1965) *supra*, 379 U.S. 536, 558 [13 L.Ed.2d 471, 486, 85 S.Ct. 453].)

Remarkably similar to the instant case is *Kissinger* v. *New York Transit Authority* (1967) 274 F.Supp. 438. There the transit authority limited advertising in its subway trains and stations to commercial advertising for the sale of goods, public service announcements, and political advertising at the time

of and in connection with elections. Plaintiffs sought to place an anti-war poster for display upon the same terms applicable to other advertisers, but the company which handled the authority's advertising business refused. The court held that absent a showing of a clear and present danger, the guarantee of freedom of speech would extend to the poster and that plaintiffs' rights in this regard would be abridged if the authority accepted commercial displays but refused to permit that offered by plaintiffs.

In *Thomas* v. *Collins* (1945) *supra,* 323 U.S. 516, 529-530 [89 L.Ed. 430, 439-440, 65 S.Ct. 315], the court was confronted with the duty "to say where the individual's freedom ends and the state's power begins. Choice on that border, now as always delicate, is perhaps more so where the usual presumption supporting legislation is balanced by the preferred place given in our scheme to the great, the indispensable democratic freedoms secured by the First Amendment. [Citations.] That priority gives these liberties a sanctity and a sanction not permitting dubious intrusions. . . . [W]hatever occasion would restrain orderly discussion and persuasion, at appropriate time and place, must have clear support in public danger, actual or impending."

Transit advertising is an acceptable and effective means of communication. A regulation which permits those who offer goods and services for sale and those who wish to express ideas relating to elections access to such forum while denying it to those who desire to express other ideas and beliefs, protected by the First Amendment, cannot be upheld.

The order granting the preliminary injunction is affirmed.

Traynor, C. J., Peters, J., and Sullivan, J., concurred.

BURKE, J.—I dissent. The majority base their opinion upon a single assumption: The governing board of defendant district has opened up the advertising spaces on district buses as "a forum for the expression of ideas." If this premise were sound, then First Amendment rights would be involved and I would join in the majority conclusion that the board may not pick and choose between ideas advanced.

But no board policy determination even mentions offering such a forum. And the written contract between the board and the advertising agency provides specifically to the contrary.

With but one very limited exception, the distrit board has expressly restricted the use of the bus display cards to commercial advertising for the sale of goods and services. The exception pertains to a reservation of space for use by candidates and by proponents of ballot measures (opponents, too) in local elections. There, however, as the majority point out, the board and defendant advertising agency have gone beyond the call of duty in order to afford all candidates and both sides of every local election issue full opportunity to expose their views, even to the extent of *searching out* the opponents and informing them of the opportunity to utilize card space to make their views known. Certainly, there can be no criticism of board policy with respect to the exercise of First Amendment rights as they may involve local elections.

Turning now to commercial advertising, the board correctly concluded, and the majority concede (*ante,* p. 57), that a "long line of decisions has established the rule that commercial messages do not come within the orbit of the First Amendment and may be regulated or prohibited by the government in the same manner as other business affairs."

It must follow then, as to the use of bus advertising spaces for commercial purposes, the board has in no way transgressed upon First Amendment rights.

There is another compelling reason why this judgment should be reversed. The majority parade a list of horrible examples which they say existing board policies might permit to occur; e.g., a company may advertise its brand of cigarettes (commercial advertising) but a cancer society may not caution that cigarette smoking is injurious to health (noncommercial, since it does not relate to the sale of goods or services). But, since the majority concede that commercial advertising does not involve First Amendment rights, how does that problem concern us? Secondly, we should recall that since commercial advertising is not protected and ads of particular classes of products need not be accepted, there is nothing to stop the board from prohibiting *all* such ads, including those for the sale of cigarettes, liquor, unclean films, pornographic books, air pollutants, etc. This transit board as an *elected* body is responsive to the will of the electorate. Its members are even subject to recall and its legislative ordinances to the initiative and referendum. Consequently, should any of the parade of horribles come to pass I believe we may rely on the elective board to act, or absent their acting then upon the district electorate.

.

Furthermore, transit districts and their facilities are *not* public parks, schools, streets or meeting halls. Instead, such districts are established to meet the basic *transportation* needs of a community; to provide a rapid and inexpensive method of moving people en masse from point to point in a local area; and to relieve local traffic congestion with its attendant time-consuming delays and hazards to life and limb. To meet these needs the voters of the district elect a board of directors, which the Legislature has charged with the responsibility of operating the transit system. (Pub. Util. Code, §§ 24883-24885.)[1] This board must attempt to provide service which is not only rapid, efficient, comfortable, attractive and convenient, but also at rates low enough to induce mass use of the facilities by the public.

The board must exercise business and managerial judgment in carrying out its responsibilities. The decision to augment revenues by selling advertising space on the district's buses is such an exercise of managerial judgment. Likewise is the decision with respect to the *kinds* of advertising matter that will be accepted.

These are strictly policy determinations lodged by the Legislature *exclusively* within the purview of the board of directors. The board's decisions as to advertising in the buses avoids even the *appearance* of espousing controversial ideas which might antagonize or alienate customers or lead to altercations on the buses themselves.[2] We can take judicial notice that buses, busdrivers and patrons are not infrequently victimized during periods of disorder and strife. Certainly buses are vulnerable, and prudence and public safety require that passengers be protected from being drawn into areas of public controversy.

Plainly, such policy determinations are in no sense arbi-

---

[1]Section 24883: ''The board is the legislative body of the district and determines all questions of policy.''

Section 24884: ''All matters and things necessary for the proper administration of the affairs of the district which are not provided for in this division shall be provided for by the board.''

Section 24885: ''The board shall supervise and regulate every transit facility owned and operated by the district, including the fixing of rates, rentals, charges, and classifications, and the making and enforcement of rules, regulations, contracts, practices, and schedules, for or in connection with any transit facility owned or controlled by the district.''

[2]That this policy of limiting the use of advertising space is not unique to the present defendant transit district, see *Kissinger* v. *New York City Transit Authority* (1967) 274 F.Supp. 438.

trary or capricious nor do ·they constitute an abuse of the discretion and judgment lodged by law in these elected public officials. Accordingly, they are entitled to the support of the courts.

Nor has the board's policy here under attack been shown to be unreasonable or to result in unconstitutional discriminations. Compelling the district to void its contract and to open up its limited advertising spaces to the uncertainties, vagaries and risks of serving as a ''forum for the expression of ideas,'' or in the alternative to ban advertising entirely, may well frustrate the board's attempts to generate the highest advertising revenues commensurate with sound business judgment and with its statutory duty to render transit service at lower cost to the public.

I would reverse the judgment granting the preliminary injunction.

McComb, J., and Schauer, J.,* concurred.

The petition of appellant district for a rehearing was denied January 17, 1968. Schauer, J.,* sat in place of Tobriner, J., who did not participate therein. McComb, J., Burke, J., and Schauer, J.,* were of the opinion that the petition should be granted.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.