LEHMAN, APPELLANT, *v.* CITY OF SHAKER HEIGHTS ET AL., APPELLEES.

(No. 72-389—Decided May 23, 1973.)

*Mr. Harry J. Lehman, in propria persona,* and *Mr. Leonard Schwartz.*

*Mr. Walter C. Kelley, Jr.,* director of law, for appellee city of Shaker Heights.

*Messrs. Baker, Hostetler & Patterson* and *Mr. H. Stephen Madsen,* for appellee Metromedia, Inc.

CORRIGAN, J. We are confronted herein with important issues of constitutional dimension in which appellant urges that the Shaker Heights Rapid Transit System, owned and operated by the city of Shaker Heights, which accepts paid commercial advertising for display in its rapid transit vehicles, may not refuse to accept paid political advertising because such refusal is a violation of a citizen's rights of free speech and equal protection under the First and Fourteenth Amendments to the United States Constitution and Section 11 of Article I of the Ohio Constitution.

The "freedom of speech and press" issue raised by appellant may be succinctly stated: It is whether or not the acceptance of commercial advertisements and their display in publicly owned and operated rapid transit vehicles results in the creation of "forums," such as newspapers, magazines, radio and television, wherein free expression of ideas is constitutionally mandated.

We hold that it does not. As pointed out in the brief of appellee city of Shaker Heights: "A long line of decisions has established the rule that commercial messages do not come within the orbit of First Amendment protection." See Freedom of Expression in a Commercial Context, 78 Harvard L. Rev. 1119.

In other words, the constitutionally protected right

of free speech with respect to forums for oral speech, or the dissemination of literature on a city's streets, does not extend to commercial or political advertising on rapid transit vehicles. Although the city has elected to lease space on its rapid transit vehicles for commercial advertisements, it does not follow that the city must accept political advertisements.

There is an obvious and fundamental difference between transit vehicles and communications media such as newspapers, magazines, radio and television, the primary purpose of each of which is to serve as a forum for the exchange and interplay of ideas. The city has not opened up its transit vehicles to any exchange or presentation of ideas, political or otherwise. The sale of space for commercial advertising in or upon the rapid transit vehicles does not create such a forum, nor does it confer First Amendment rights.

The constitutional language is simple. The First Amendment to the United States Constitution provides:

"Congress shall make no law * * * abridging the freedom of speech, or of the press * * *."

Section 11 of Article I of the Ohio Constitution reads:

"Every citizen may freely speak, write, and publish his sentiments on all subjects * * * and no law shall be passed to restrain or abridge the liberty of speech, or of the press. * * *"

The establishment of a commercial advertising program on these rapid transit vehicles was not intended to create a free speech forum or a free press, and we will not torture these concepts to pressure such a commercial advertising plan into First Amendment ambits. The proponents are confusing free speech forums with the marketplace. Purveyors of goods and services saleable in commerce may purchase advertising space on an equal basis, whether they be house builders or butchers. They are coursing in the stream of commerce. But the Rapid Transit System has determined that political advertising is not acceptable as a matter of long-time policy because of the "chanc-

es for abuse, the possibility of discrimination or favoritism, and the risk of violating the passengers' rights." There is no distinction as to candidates. As a class, they are excluded from using the rapid transit vehicles for their political advertising.

It was pointed out by Justice Brandeis, in *Packer Corp.* v. *Utah* (1932), 285 U. S. 105, 110, that street car advertising is a special class of advertising. The Utah Supreme Court was quoted with approval in the opinion:

" '* * * Advertisements of this sort are constantly before the eyes of observers on the streets and in street cars to be seen without the exercise of choice or volition on their part. Other forms of advertising are ordinarily seen as a matter of choice on the part of the observer. The young people as well as the adults have the message of the billboard thrust upon them by all the arts and devices that skill can produce. In the case of newspapers and magazines, there must be some seeking by one who is to see and read the advertisement. The radio can be turned off, but not so the billboard or street car placard. These distinctions clearly place this kind of advertisement in a position to be classified so that regulations or prohibitions may be imposed upon all within the class. * * *' "

It is well stated in 16 American Jurisprudence 2d 905, Constitutional Law, Section 518, that:

"The general rule that legislation which affects alike all persons pursuing the same business under the same conditions is not such class legislation as is prohibited by constitutional provisions is subject to limitation to the extent that it does not permit discriminations by which persons engaged in the same business are subjected to different restrictions or are held entitled to different privileges under the same conditions. The power of the legislature to impose restrictions on a lawful calling must be exercised in conformity with the constitutional requirement that such restrictions must operate equally upon all persons pursuing the same business or profession under the same circumstances. * * *"

Particular individuals may not be selected from a class or locality and subjected to peculiar rules or have special obligations or burdens imposed upon them from which others in the same class or locality are exempt.

It is stated further in 16 American Jurisprudence 2d 906, Section 518:

"* * * The constitutional guaranty as to the equal protection of the laws * * * requires that no impediment should be interposed to the pursuits of anyone execept as applied to the same pursuits by others under similar circumstances, and that no greater burdens in engaging in a calling should be laid upon one than are laid upon others in the same calling and condition."

As a class, all candidates for political office are treated alike under the Shaker Heights Rapid Transit System's commercial advertising policy, and that is exactly the extent of their rights under the constitutions of Ohio and of the United States.

As indicated in *Valentine* v. *Chrestensen* (1942), 316 U. S. 52 (a case involving a commercial message on one side of a handbill and a political message on the other side), the control of *commercial* advertising is entirely within the scope of local government. It seems to follow logically that a local government may regulate the type of commercial advertising it accepts, and that it is within the authority of that local government to accept only commercial advertising, absent a specific holding to the contrary on this question by the Supreme Court of the United States.

Manifestly, there is no denial of equal protection of the laws, as claimed by plaintiff, because everybody in his class as a candidate for public office is treated identically, and his political advertising is not accepted because of policy. Shaker Heights sets plaintiff's class apart from house builders, butchers and other business entrepreneurs who regularly patronize the commercial advertising market and who are the commercial customers of the Shaker Heights Rapid Transit System advertising plan.

For the above reasons, the judgment of the Court of Appeals is affirmed.

*Judgment affirmed.*

HERBERT, CELEBREZZE and P. BROWN, JJ., concur.
O'NEILL, C. J., STERN and W. BROWN, JJ., dissent.

STERN, J., dissenting. This case of first impression in Ohio revolves on the issue of whether a municipality, an arm of state government, is constitutionally prohibited from forbidding paid political[1] advertisements from appearing at any time in a place which that same arm of state government has deemed to be proper for the display of paid commercial advertisements. I feel that such conduct is constitutionally prohibited.

It should be noted that the issue herein is not whether a municipality must permit advertising of any nature on its rapid transit system. That issue is avoided since Shaker Heights has deemed it proper to encourage the display of paid commercial advertisements on its transit system.

Article 15[2] of the contract between Shaker Heights and Metromedia prohibits Metromedia from accepting political advertisements for display on Shaker's transit system. Such

---

[1] Neither party has elucidated as to the meaning of the term "political" advertisement as used herein. I assume, therefore, that it is restricted to its usual meaning of expression of ideas "pertaining or relating to the policy or the administration of government, state or national." Black's Law Dictionary (4 Ed.). This, of course, would include promoting or urging the defeat of candidates for public office or of issues to be submitted to the electorate.

[2] "15. All advertising matter at any time inserted or placed by the contractor in or upon any of said cars shall be subject to approval by Shaker Heights and shall be of reputable character, and if any immoral, vulgar, disreputable or libelous advertisements are so placed or inserted at any time during the term of this agreement, the contractor will remove the same promptly upon request of Shaker Heights, and if the contractor shall fail to do so, the employees of Shaker Heights may forthwith remove the same. The contractor shall not place political advertising in or upon any of the said cars or in, upon or about any other additional and further space granted hereunder."

a contract, by an Ohio municipality, constitutes state action.[3] subject to the prohibition of Section 11, Article I of the Ohio Constitution. *Peltz* v. *South Euclid* (1967), 11 Ohio St. 2d 128. Such state action also invokes the protection of the First and Fourteenth Amendments to the United States Constitution. *Peltz, supra; Gitlow* v. *New York* (1925), 268 U. S. 652.

Appellant argues that such state action (1) denies him equal protection of the laws, and (2) deprives him of freedom of speech and the press. Before discussing either, I wish to examine the nature of the denial imposed upon appellant.

The use of posters and signs as a method of disseminating information has gained widespread usage throughout this country and this method is widely used for political, commercial, charitable and civic purposes. When accomplished for purely commercial reasons, such method of expression does not constitute speech within the protection of the First Amendment. *Valentine* v. *Chrestensen* (1942), 316 U. S. 52; *Breard* v. *Alexandria* (1951), 341 U. S. 622; *Peltz, supra.*

However, where such method of expression is used for political purposes, it constitutes a vehicle for communication of information and opinion which is not only concurrent with the historic connotation of First Amendment rights, as defined in *Lovell* v. *Griffin* (1938), 303 U. S. 444, but is also concurrent with the concept of assurance of freedom upon which our form of government rests, and the First Amendment protection is neither lessened by the fact that the political message is proposed as a paid advertisement (*New York Times Co.* v. *Sullivan* [1964], 376 U. S. 254, 266), nor that alternative methods of dissemination exist. (*Schneider* v. *State* [1939], 308 U. S. 147, 163.) Accordingly, it is not only in the best interest of government

---

[3]I am not concerned herein with conduct by a private citizen or by a private organization. This contract is the direct result of action by a municipal corporation which has been established as an instrumentality of state government.

that these methods of communication be encouraged, but it is mandated by our Constitution.

This is not to say that a municipality may not absolutely prohibit the display of advertisements on its rapid transit system or other property under the control of the city. Notwithstanding the free-speech forum which historically exists on public sidewalks and parks, rapid transit systems do not inherently constitute such a forum. Further, the mere creation of a display arena for paid advertisements does not imply that the municipality has waived its right to appropriately regulate advertisements as to time, place, and manner of dissemination. However, such regulations must be in support of an appropriate governmental interest.

There exists, then, a situation in which a municipality has decided to permit paid *commercial* advertisements in a locale in which it entirely prohibits the display of paid *political* advertisements. For that reason, I choose to analyze this case in terms of the equal protection clause of the Fourteenth Amendment.

Although I do not feel compelled to resolve the First Amendment issue, I do feel that that issue cannot be resolved without considering the effect that the allowance of the display of public service advertisements would have on the question of whether a free-speech forum has been created. Such advertisements do not constitute pure commercial communication, and therefore merit consideration on the issue of creation of a free-speech forum.

A fundamental element of the equal protection argument is a determination of whether there is an appropriate governmental interest suitably furthered by the differential treatment afforded these two classes of paid advertisements. See *Chicago* v. *Mosley* (1972), 408 U. S. 92; *Reed* v. *Reed* (1971), 404 U. S. 71; *Dunn* v. *Blumstein* (1972), 405 U. S. 330.

Public facilities have a primary public function or purpose to serve, and the assurance by the municipality of the accomplishment of this function or purpose is properly

left to the discretion of that body. Public schools constitute such a facility, having as a primary purpose the education of our children, and while it may not be mandatory that a school auditorium be made available as a forum for the expression of First Amendment ideas, it is certain that it cannot arbitrarily be made available as a forum for the expression of some of these ideas to the exclusion of others.

School auditoriums, however, are seldom used as an arena solely for the dissemination of purely commercial expressions. Consequently, cases involving school auditoriums, public parks, etc., generally involve questions of freedom of speech, necessitating the application of the "clear and present danger" test. See *Terminiello* v. *Chicago* (1949), 337 U. S. 1; *Thomas* v. *Collins* (1945), 323 U. S. 516. Free-speech forums can also be created in regard to other public facilities, including rapid transit systems, for in *Wirta* v. *Alameda-Contra Costa Transit Dist.* (1967), 64 Cal. Rep. 430, 434 P. 2d 982, in addition to allowing paid commercial advertisements to be displayed on the transit system, paid political advertisements were authorized at prescribed times. Thus, a forum for the expression of First Amendment views had been created, and, as that court held, other advertisements expressing opinions and beliefs within the ambit of First Amendment protection could not then be prohibited for reasons of administrative convenience. See, also, *Kissinger* v. *New York City Transit Authority* (S. D. N. Y. 1967), 274 F. Supp. 438.

For additional cases on this and related issues, see *Business Executives' Move For Vietnam Peace* v. *Federal Communications Comm.* (C. A. D. C. 1971), 450 F. 2d 642; *Danskin* v. *San Diego Unified School Dist.* (1946), 28 Cal. 2d 536, 171 P. 2d 885; *Hillside Community Church* v. *Tacoma* (Wash. 1969), 455 P. 2d 350; *Lee* v. *Bd. of Regents of State Colleges* (W. D. Wis. 1969), 306 F. Supp. 1097; *Zucker* v. *Panitz* (S. D. N. Y. 1969), 299 F. Supp. 102; *Radical Lawyers Caucus* v. *Pool* (W. D. Tex. 1970), 324 F. Supp. 268; *Ross* v. *Goshi* (D. C. Hawaii 1972), No. 72-3610, decided December 8, 1972.

In any event, it is beyond dispute that appellees have created an arena for the display of paid advertising. (*Wirta, supra.*) In deciding to create such an arena, the city examined the deterimental effects which such displays might have on the primary purpose of transporting people, apparently finding that the primary function could be accomplished while gaining the pecuniary advantage of providing space for the display of paid *commercial* advertisements.

I do not discount the possibility that under some circumstances the differing nature of political and commercial advertising might justify permitting one to the exclusion of the other. However, I find no such circumstances herein.

This method of disseminating beliefs and opinions is not dependent upon the *nature* of the subject matter being dispersed, and any legitimate objections which a municipality might have toward the time, place, and manner of dissemination would be the same, whether the nature of the advertisement be commercial, political, or public service. Each advertisement could reasonably be regulated as to such things as size, obtrusiveness, and the time period over which each advertisement may be displayed. Indeed, the policy followed by Metromedia in regard to other transit systems[4] provides such control now.

---

[4] I note, for reference purposes only, appellee Shaker Heights' exhibit A, which sets forth the Metro Transit Advertising Copy Policy as follows:

"(1) Metro Transit Advertising will not display advertising copy that is false, misleading, deceptive and/or offensive to the moral standards of the community, or contrary to good taste. Copy which might be contrary to the best interests of the transit systems, or which might result in public criticism of the advertising industry and/or transit advertising will not be acceptable.

"(2) Metro Transit Advertising will not accept any political copy that pictorially, graphically or otherwise states or suggests that proponents or opponents of the persons or measures advertised are vulgar, greedy, immoral, monopolistic, illegal or unfair.

"(3) All copy subject to approval. Rough sketches with proposed copy required on all political advertising.

It follows that, to the extent the city has allowed those disadvantages of commercial advertising which are identical to disadvantages of political advertising, it is estopped from voicing such disadvantages in support of its absolute prohibition of political advertising.

However, appellees contend that the display of paid political advertisements on the city's transit system presents additional unique disadvantages, such as: (1) They might be interpreted as an endorsement by the city of a particular person or idea; (2) there exists a reasonable chance for abuse, the possibility of discrimination or favoritism; (3) the risk of violating the passengers' rights; and (4) the controversial nature of political advertisements.

That the first of these evils can be negated by requiring a statement of nonendorsement on the face of the advertisement is beyond question. Even in the absence of such a disclaimer, it is doubtful that a political advertise-

---

"(4) Metro Transit Advertising reserves the right at all times to decline both sides of any proposition and/or opposing candidates.

"(5) Political advertising must carry, visible within the advertising area of the poster, the tag-line:

"'Paid Political Advertising Sponsored by . . .' in letters sized as follows:

"Exterior:  30" x 144" King size posters - 1"
            21" x 44" Traveling displays - ½"
            21" x 72" Taillight spectacular - 1"
"Interior:  11" x 28" - ¼"    11" x 56" - ¼"

"(6) Contracts for political advertising space must be accompanied by check for entire amount of contract.

"(7) Posters and/or cards must be delivered, prepaid, 10 days prior to posting date.

"(8) Equal opportunity to purchase space will be offered and allotted for each opposing candidate, bond issue or referendum. If necessary, contracts for political advertising will be held until 30 days prior to the contract posting date, at which time Metro Transit Advertising will allocate the advertising space to each candidate, issue or referendum.

"(9) Minimum order acceptable for either cards or posters is at the one-[month rate].

"(10) Political advertising will not be accepted on following systems: Shaker Rapid—Maple Heights—North Olmsted—Euclid, Ohio."

ment, as is here contemplated, would be interpreted as an endorsement by the city of a particular candidate or of one side of a particular issue any more than the display of a particular commercial advertisement would be thought of as an endorsement by the city of a particular commercial product.

The conjectured possibility that favoritism might be shown to one party over the other is likewise no justification for this absolute discrimination against paid political advertisements. There being no evidence in the record supporting this contention, I feel that the presumption must be made that those responsible would fulfill their duties in a fair manner. Further, so long as the potential space is made equally available to all who seek it (whether taken advantage of or not, see *Wirta, supra*), there is little chance that only one of the parties would be permitted to utilize the space. This further negates the possible presumption of endorsement, since all sides of an issue could be advertised.

As to the risk of violating passengers' rights, I acknowledge that to some extent rapid transit passengers constitute a captive audience. As indicated in the majority opinion, magazines and newspapers must be sought out by a reader and radios can be turned off, while advertisements of the sort involved herein "* * * are constantly before the eyes of observers * * *." *Packer Corp.* v. *Utah* (1932), 285 U. S. 105, 110. However, this does not mean that the right of a passenger on a transit system to privacy is not subject to reasonable limitations in relation to the rights of others, for, as stated in *Public Utilities Comm. of D. C.* v. *Pollak* (1952), 343 U. S. 451, 464, "* * * however complete his [a passenger's] right of privacy may be at home, it is substantially limited by the rights of others when its possessor travels on a public thoroughfare or rides in a public conveyance." That case held that a transit system could broadcast a radio program within its vehicles, despite the fact that individual passengers could not shut the broadcast off.

The lack of choice of the passengers involved in *Pollak, supra,* is far greater than that involved herein, for these passengers are not compelled to read or even to look at the advertisements. Further, it could not be any less violative of a passenger's rights to "confront" him with commercial advertisements than to "confront" him with political ones.

Finally, I find no evidence to support appellees' contention that either the political advertisement submitted by appellant, or paid political advertisements in general, are of such a controversial nature as to create a potential danger to passengers. Indeed, it is in the interest of better government that some controversy over political issues be created.

It is my conclusion that where a municipality has created an arena for the display of paid advertisements by providing facilities for such paid advertisements on its rapid transit system, it cannot, in the absence of an appropriate governmental interest, discriminate against paid political advertisements in favor of paid commercial advertisements.

Having determined that the refusal to accept appellant's political advertisement for display constitutes a denial of equal protection contrary to the Fourteenth Amendment, I see no need to further examine the issue of whether a First Amendment forum is created when, by state action, an area of public property is made available for the expression of ideas and beliefs, most of which are not protected by the First Amendment.

I would reverse the judgment of the Court of Appeals.

O'NEILL, C. J., and W. BROWN, J., concur in the foregoing dissenting opinion.