Michael FRIEDMAN, as President of Bay Shore Classroom Teachers' Association, and suing on behalf of himself and all other teachers employed by Union Free School District No. 1, Town of Islip, Suffolk County, New York, and similarly situated, Plaintiff,

v.

UNION FREE SCHOOL DISTRICT NO. 1, TOWN OF ISLIP, Suffolk County, Raymond R. Howard, Superintendent of Schools of said school district and Manus H. O'Donnell, Assistant Superintendent of Schools of said school district, Defendants.

No. 69–C–1205.

United States District Court,
E. D. New York.

June 15, 1970.

Leonard G. Kramer, East Islip, N. Y., for plaintiff.

Robbins, Wells & Walser, Bay Shore, N. Y., for defendants, by Richard W. Walser, Bay Shore, N. Y.

Sneeringer & Rowley, Albany, N. Y., for New York Teachers Association amicus curiae.

ZAVATT, District Judge.

Both plaintiff and defendants have moved for summary judgment. The plaintiff's motion for summary judgment is granted; the defendants' cross-motion for summary judgment is denied.

Plaintiff, a teacher in defendant school district, is the President of the Bay Shore Classroom Teachers' Association (BSCTA), the duly certified exclusive bargaining agent of the school district's employees pursuant to Article 14 of the Civil Service Law of New York ("Taylor Law"), McKinney's Consol. Laws, c. 7. He sues on behalf of himself and all other teachers employed by defendant school district (the District). The District was organized as a union free school district pursuant to the Education Law of the State of New York. The defendant Howard is the Superintendent of Schools of the District; the defendant O'Donnell is the Assistant Superintendent of Schools.

The dispute in question concerns the constitutionality of section 11F–21 (11F–21) of "Administrative Manual" (Manual) of the District which provides as follows:

> 11F–21 *Staff Solicitations and Distribution of Material to Staff Members: School Mailboxes and All Other School District Facilities* Faculty mailboxes, as well as all other school building facilities, are the property of the School District and are maintained for the convenience of the School District in carrying out its duties and in the administration of its affairs. Distribution through such facilities shall be limited to items of official business of the Bay Shore School District only, e. g., official school notices and other distributions by the Superintendent's Office, (such as items of community or public interest and recognized charitable appeals) principals' or directors' notices, departmental announcements, etc., and routine internal distribution of any exclusive negotiating agent for school district employees recognized or certified pursuant to the provisions of the Public Employees' Fair Employment Act.

> The distribution, posting, or display of all other literature, materials or notices shall be prohibited.

> 'Routine internal distributions' shall be defined as notices of meetings, elections, results of elections, and social events. The distribution of newsletters, position papers, materials of other organizations, or any other communications which do not concern themselves with the routine operation of an exclusive negotiating agent shall be prohibited.

The plaintiff claims that this section of the Manual is unconstitutional and void on its face and in its application to plaintiff in that it constitutes a deprivation of freedom of speech in violation of the First and Fourteenth Amendments. Plaintiff demands judgment:

(1) declaring section 11F–21 of the Manual void on its face;

(2) declaring that the application thereof (as hereinafter set forth) violates the plaintiff's First Amendment rights;

(3) enjoining the defendants from applying and enforcing said section;

(4) enjoining the defendants from preventing the plaintiff from distributing "The Voice," a BSCTA publication, and other literature on school property;

(5) awarding plaintiff costs and disbursements.

The defendants counter these assertions by claiming that the plaintiff must first submit this claim to arbitration; that the matter is one that should properly be negotiated between the parties; that said section is a reasonable exercise of the powers of the Board of Education under sections 1709 and 414 of the New York Education Law, McKinney's Consol.Laws, c. 16. These sections vest title to public school premises and control

over its facilities in the Board of Education of the District. N.Y. Education Law § 1709(9).

On September 2, 1969 the BSCTA and the District concluded negotiations and signed a collective bargaining agreement, expiring July 1, 1970, defining the conditions and terms of employment of the teachers of the District. It appears that 11F–21 was discussed during the negotiations but that the teachers were unable to convince the Board to repeal it and were also unwilling to bargain for its repeal by dropping several other bargaining demands. The subject was dropped from the negotiations and 11F–21 remained part of the Manual which was incorporated by reference into the collective bargaining agreement. It is important to note the 11F–21 became part of the Manual on June 19, 1968, by unilateral action of the Board, well before the negotiations leading to the present contract between the parties. (Affidavit of defendant O'Donnell).

The teachers made good their promise to test the constitutionality of 11F–21 in the courts (Affidavit of Friedman) when they distributed copies of "The Voice" through faculty mailboxes and in other school areas, two days after the contract was signed, thus precipitating the present action.

On September 8, 1969, defendant O'Donnell sent a letter to Joan Best, Corresponding Secretary of the BSCTA, informing her that such distribution was in violation of section 11F–21 and stating, *inter alia*, that:

> The wording of Section 11F–21 is clear in that except for certain limited specific items, no distributions through faculty mailboxes or school facilities are permitted. This would, of course, cover distribution by hand whether before or after hours of work, as long as such distribution is on school district property * * *. I would urge you to meet with me * * * since further violation of the policy, after this written notice would leave this office with rather limited alternatives.

That same day a Superintendent's Bulletin entitled "Clarification of Distribution Policy" was issued. The "clarification" of 11F–21 reiterated that only "routine internal distributions" of the BSCTA were permitted. It also stated that:

> All other distributions are prohibited. It should be noted that even if an unauthorized distribution were to take place before or after the normal work day, informally in hallways, lunchrooms, parking lots, etc., it would still be in violation of policy.

After stating that it is the duty of any administrator to report any infraction of this rule and to direct that any such infraction cease, it added that "[i]f the action continues in the face of such direct advice, further action would ensue."

*Is section 11F–21 constitutional?*

The defendants contend that no constitutional issue is presented by the section in question. They argue that, under sections 1709 and 414 of the New York Education Law,[1] title to the prem-

---

1. § 1709. Powers and duties of boards of education

The said board of education of every union free school district shall have power, and it shall be its duty:

\* \* \* \* \*

2. To establish such rules and regulations concerning the order and discipline of the schools, in the several departments thereof, as they may deem necessary to secure the best educational results.

\* \* \* \* \*

9. To take charge and possession of the schoolhouses, sites, lots, furniture, books, apparatus, and all school property within its district; and the title of the same shall be vested respectively in said board of education.

\* \* \* \* \*

33. To have in all respects the superintendence, management and control of the educational affairs of the district, and, therefore, shall have all the powers reasonably necessary to exercise powers

ises and facilities of the District is vested in the school board along with the concomitant power reasonably necessary to carry out the duties granted it under said sections. § 1709(33). Among these is the power "to establish rules and regulations concerning the order and discipline of the schools * * *." § 1709(2).

It is the Board's position that its limited distribution policy is reasonable, in that it prevents the school board from becoming a censor of material distributed on school premises. In other words, the Board (with the limited exceptions of 11F–21 not here relevant) has prevented itself from deciding what particular items are or are not properly distributable in the schools by forbidding the distribution of all literature. A further statement of the Board's rationale behind 11F–21 is that:

> * * * it preserves the order and decorum of the school buildings, insures that the facilities of the school district are utilized for the purpose of educating the children of the District only, and makes it unnecessary for the administration staff of the School District to judge the merits or demerits of any request to distribute literature * * *. (Howard affidavit p. 3).

There is also a gratuitous suggestion that the distribution of BSCTA material, during periods of negotiation, is disruptive to the extent that,

> [a]t times it *appears* that the advancement of education within the District is forgotten altogether in the turmoil and tension that precedes the reaching of the final negotiated agreement. (Emphasis added).

There is, however, no specific allegation that such disruption ever took place in actuality.

It is of note that 11F–21, as interpreted, does not ban the use of the mailboxes in question if the literature or mail in question is mailed to the school through the United States mail. For example, if the faculty members had put a six cent stamp on "The Voice," and had placed it in a Government Post Office mailbox, it would have been placed in the school mailboxes pursuant to school board policy. However, the placing of "The Voice" directly in the faculty mailbox or in other areas of the school is prohibited.

This policy regarding the use of mailboxes is important when considering the reasonableness of the regulation in question. But it must be borne in mind that the 11F–21 prohibition reaches far beyond the faculty mailboxes and "The Voice." It prohibits the distribution of *all* literature by teachers in *all* areas of the school premises at *all* times (with the limited exception of "routine internal distributions").

In Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), the Supreme Court reversed an Eighth Circuit decision which had upheld the power of school principals to suspend students who wore black armbands to protest the war in Vietnam.

> First Amendment rights, applied in light of the special characteristics of the school environment, *are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expres-*

granted expressly or by implication and to discharge duties imposed expressly or by implication by this chapter or other statutes.

§ 414. Use of schoolhouse and grounds out of school hours

Schoolhouses and the grounds connected therewith and all property belonging to the district shall be in the custody and under the control and supervision of the trustees or board of education of the district. The trustees or board of education may adopt reasonable regulations for the use of such schoolhouses, grounds or other property, when not in use for school purposes, for such other public purposes as are herein provided. * * *

*sion at the schoolhouse gate.* This has been the unmistakable holding of this Court for almost 50 years. 89 S. Ct. at 736 (emphasis added).

The Court recognized that the "comprehensive authority" of school officials must be exercised consistently with "fundamental constitutional safeguards." The "speech" in question was akin to pure speech, and there was no evidence that the wearing of the armbands caused any disorder or interfered with the education of the other children. "Fear of a disturbance" was rejected as a reasonable rationale behind the principal's action:

> In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. *Certainly where there is no finding and no showing that engaging in the forbidden conduct would "materially and substantially interfere with the requirement of appropriate discipline in the operation of the school," the prohibition cannot be sustained.* 89 S.Ct. 738 (emphasis added).

See Burnside v. Byars, 363 F.2d 744, 749 (5th Cir.1966)

The court also noted that:

> state-operated schools may not be enclaves of totalitarianism. School officials do not possess absolute authority over their students. * * * They may not be confined to the expression of those sentiments that are officially approved. * * * 89 S.Ct. at 739.

Concern with the First Amendment constitutional rights of teachers is not new, having been expressed in other Supreme Court decisions. *See e. g.*, Keyishian v. Board of Regents of University of the State of New York, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *Cf.* Garrity v. State of New Jersey, 385 U.S. 493, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967).

That the implication of *Tinker* encompasses more than the rights of students is recognized in the recent case of Los Angeles Teachers Union, etc. v. Los Angeles City Board of Education, Cal., 78 Cal.Rptr. 723, 455 P.2d 827 (1969). In that case a teachers' union distributed to its members a petition (opposing Government cutback in spending for higher education and requesting increased revenues for public education) to be circulated in faculty rooms and lunchrooms during off duty periods. The Board forbade such distribution. The Supreme Court of California, while recognizing that a school board has legitimate interests to protect, noted that teachers also had corresponding First Amendment rights. It cited Terminello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L. Ed. 1131 (1949) for the proposition that:

> The danger justifying restriction or prohibition must be one which "rises far above public inconvenience, annoyance, or unrest". 78 Cal.Rptr. at 727, 455 P.2d at 831.

It cited the *Tinker* test of "facts which might reasonably have led [them] to forecast *substantial disruption of or material interference with school activities,*" 78 Cal.Rptr. at 731, 455 P.2d at 835 and concluded that any threats posed by the circulation of the petition were overcome by the First Amendment rights of the teachers. It also recognized that school premises are the most effective place for teachers to communicate with each other. *Cf.* Wolin v. Port of New York Authority, 392 F.2d 83, 90 (2d Cir.), cert. denied, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968).

The contention that the Board, as vested owner of school premises, has the absolute right to direct how its facilities may be used is without merit. In West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), in which the court rejected a school board mandatory flag salute regulation, the court stated:

> The Fourteenth Amendment, as now applied to the States, protects the citi-

zen against the State itself and all of its creatures—*Boards of Education not excepted.* These have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. 63 S.Ct. at 1185 (emphasis added).

*Barnette, supra,* was cited with approval in *Tinker, supra. See also* Wolin v. Port of New York Authority, *supra,* in which the Second Circuit, citing District Judge Mansfield, rejected the Port Authority's argument that, since title was vested in its name, it could control the premises (including distribution rights of certain pamphleteers):

" 'Ownership does not always mean absolute dominion.' " 392 F.2d at 88.

The court finds that the vesting of title to school property in the Board, by virtue of section 1709(9) of the New York Education Law, cannot *ipso facto* support its promulgation of 11F–21.

■ Turning now to the reasonableness of 11F–21, the court finds that the Board's rationale does not comport with the requirements of *Tinker.* That decision, and *Los Angeles Teachers, supra,* made clear that the mere fear of disturbance will not suffice; that a regulation must be based on " * * * facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school authorities." 89 S.Ct. 740. Nowhere in the papers nor on oral argument do the defendants contend that any actual disturbance took place, nor are any facts presented that would reasonably have led the Board to conclude that the order in the school would be materially disrupted were it not for the Board's anti-distribution policy. The fact that "tension and turmoil" surround the collective bargaining process, although undoubtedly true, is not the kind of interference that would save this wide prohibition.

■ The Board's suggestion that 11F–21 is necessary to keep the school clean falls far short of the kind of be-

havior that would merit its sweeping prohibition. *See Wolin, supra,* 392 F.2d at 92. The Board's specious suggestion that 11F–21 prevents all distribution in order to prevent the Board from becoming a censor is easily answered—it can accomplish the same objective by permitting all distribution, to the extent that such distribution does not materially and substantially interfere with the school's operation.

■ The facts of this case are even more extreme than *Tinker* and *Los Angeles Teachers.* In those cases a *particular* expression was involved—here, a whole range of possible speech is forbidden by 11F–21 without the slightest justification. The Supreme Court has always safeguarded First Amendment rights by striking down broad prohibitions on speech when legitimate state ends can be more narrowly achieved. *See, e. g., Shelton, supra,* 81 S.Ct. at 252 (and cases cited). The rights of students under the First Amendment should be afforded, as well, to teachers. *Tinker, supra,* recognized this principle when the Supreme Court said that neither "students [n]or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." 89 S.Ct. at 736.

■ Parenthetically, it is interesting to note that the present Board policy permits any mailed item to be distributed through the faculty mailboxes. The entire Board rationale is undermined by that interpretation of 11F–21. It can hardly be argued that the fear of litter and/or disturbance is any less by the requirement that literature come into the school enclosed in an envelope or wrapper bearing a postage stamp. As to such mail the Board is not burdened with a censorship function since all such mail is placed directly in the appropriate faculty mailbox. The court has refrained from going off on this ground for the very reason that, even if the Board were to revise its present policy by not permitting mailed items to be placed in the faculty mailboxes, 11F–21 would still fall as an unwarranted prohi-

bition of free speech rights which the Board may not deny to its teachers.

The court finds that 11F–21 is void on its face and in its application as an overbroad prohibition of the First Amendment rights of the public school teachers in the District.

What has already been said is determinative of the motions. However, the court feels compelled to answer the defendants' arguments that (1) this is properly a matter for arbitration and (2) that the contract, as agreed to, forecloses the BSCTA from challenging 11F–21's legality in the courts.

■ The Board's argument stems from its proposition that the entire matter is properly one to be resolved by the parties. With this the court agrees—indeed, the court encouraged the parties to resolve the matter between themselves. However, no accord was reached.

The oral argument of the motion brought out the fact that 11F–21 was a subject of the negotiations, but that it was dropped from discussion when the teachers refused to give up other demands in order to have 11F–21 modified or repealed. At one point in the oral argument, the Board's counsel, when asked for an example of what the BSCTA would have had to relinquish in order to get 11F–21 repealed, answered that several hundred dollars in salary was a possibility. This answer highlights the insidiousness of the Board's argument. 11F–21 was never agreed to in any collective bargaining sense—it was already a part of the "Manual" when the parties sat down to negotiate. The long and short of it is that the teachers were put in a position of having to pay (literally and figuratively) for their First Amendment rights. This is a price that the state is constitutionally prohibited from extracting. *See Garrity, supra,* 87 S.Ct. at 620, and Jones v. State Board of Education of Tennessee, 397 U.S. 31, 90 S.Ct. 779, 25 L.Ed.2d 27 (1970), cert. dismissed as improvidently granted, Douglas, J., dissenting at 34, 90 S.Ct. 780.

■ Therefore, when the BSCTA refused to bargain for its constitutional rights by dropping the subject from negotiation, it cannot be maintained that the plaintiff signed away these rights by signing the contract. The subsequent action of the BSCTA indicates that it always intended to take the matter to court for resolution. The court, not arbitration, is the proper forum to determine the constitutionality of 11F–21.

Counsel for the defendants, in his memorandum of law submitted in opposition to the plaintiff's motion, concedes that the issues in this case involve only questions of contract interpretation and arbitrability "absent any constitutional issue." There is such an issue which the court has resolved by a finding that 11F–21 is unconstitutional.

The relief requested by the plaintiff (p. 4, *supra*) is hereby granted.

Settle an order consistent with this opinion on or before ten days of the date hereof.

This is an order.