Mildred S. **DOWNS**

v.

**CONWAY SCHOOL DISTRICT.**

No. LR–70–C–160.

United States District Court, E. D. Arkansas.

June 23, 1971.

Eugene R. Warren, Little Rock, Ark., for plaintiffs.

Phil Stratton, Conway, Ark., W. Christopher Barrier, Little Rock, Ark., for defendant.

## OPINION

CLARY, Senior District Judge (Sitting by Special Designation).

Plaintiff here seeks a declaratory judgment, injunctive relief, and damages due to the alleged deprivation, under color of state law, of her rights, privileges, and immunities guaranteed by the 1st and 14th amendments of the United States Constitution. Jurisdiction is invoked pursuant to 28 U.S.C. § 1343(3) (4), 28 U.S.C. §§ 2201–2, and 42 U.S.C. § 1983, as well as under the Constitution of the United States.

The trial of the case having been held, and briefs submitted on the relevant issues of law, it is now ready for disposition.

## THE FACTS

1. The plaintiff, Mildred S. Downs, is a qualified professional teacher, having a total experience of 25½ years in the Arkansas Public School System.

2. On or about December 1, 1966, plaintiff entered into a contract with the Conway School Board and was assigned to teach the second grade in the Ellen Smith School.

3. For the years 1967–8 and 1968–9 she was again offered and signed a contract with the School Board to teach in the Ellen Smith Elementary School.

4. During the period encompassed by the 1967–68 school year a water fountain in her room became broken. She reported it to the principal who reported it to Carl White, superintendent of the maintenance department.

5. As the superintendent of maintenance, Carl White found that the fountain, which he thought was a Westinghouse fountain, was under a warranty and that the necessary parts could not be obtained under 10 days to 2 weeks, and so informed Mrs. Downs.

6. Some two to three weeks later, at a time when the temporary water supply (consisting of a plastic bucket and cups) provided by the plaintiff at her own expense for her pupils was exhausted and in need of refilling, and an art class was beginning, the teacher asked the pupils to draw pictures of their neighbors (other pupils) and express in the rough drawings the way that each one of the children of the class felt. The children drew the pictures as requested, and at least some of the pupils drew pictures of pupils lying down asking for water, wilted flowers, etc.

7. Plaintiff testified, without contradiction, that she exhibited some of these drawings to the principal and made no further dissemination thereof. The then principal, James Stone, has no recollection of this episode. I find as a fact that these "cartoons" were actually delivered to the principal. The distribution thereof is uncertain, but Carl White did receive, through the mail, several of the cartoons. He immediately threw the pictures away and none of the so-called "cartoons" were ever seen by Carl Stuart, the superintendent of schools, and the first he heard about the drawings was in October of 1969.

8. Over the period of her employment with the Conway School District the plaintiff had on numerous occasions complained to the principal that the smoke from the open burning incinerator in the center of the playground was seeping into her classroom, particularly when the wind emanated from the north or northeast which blew the smoke and debris from the open incinerator directly at and into her room. The presence of the smoke resulted in bronchial and sinus disturbances to her personally and caused obvious physical discomfort to the members of her class. Complaints about this situation were made both by the plaintiff and her husband directly to the superintendent of schools. Unfortunately the then superintendent of schools was ill and no action was taken by the school superintendent or board to remedy the condition. In addition to the smoke haz-

ard, the plaintiff testified, without contradiction, and the Court finds as a fact, that the burning of the trash in an open incinerator during school hours and recess hours constituted an open and imminent danger to the students of the plaintiff as well as other students in the school. It was testified, without contradiction, that one handicapped child made a habit of trying to ignite branches or sticks with which, after being ignited, he would run after and threaten other pupils in the immediate vicinity. Again it was testified, without contradiction, that the plaintiff herein, pursuant to her feeling of obligation, telephoned the mother of the pupil, who thereafter accompanied her child to school and at all times supervised him personally while he was playing in the school yard for the balance of the year. In addition to the smoke and flying debris, the testimony showed beyond peradventure of doubt that the overflow from the incinerator (burned and rusted tin cans, broken bottles, etc.) fell from the incinerator and constituted an obvious hazard to the children playing either basketball or baseball (See EX TT's EX 12 a b c). The testimony also showed that the children were attracted to the burning incinerator, climbed in and around the wall of the incinerator, and that it was only the extended and diligent supervision of the area afforded by the school teachers that prevented any substantial accident to any of the pupils. The evidence is also uncontradicted and shows that both plaintiff and her husband, in an effort to eliminate the whole hazard from the school, offered on several occasions to pay out of their own pockets the cost of trash removal to eliminate the hazard. The then superintendent of schools made no reply to this offer.

9. At the beginning of the 1968-9 session there was furnished, in addition to the open incinerator a barrel-type incinerator with a small smoke stack extruding from the top. The barrel-type incinerator was of limited capacity, and overflowed regularly, making necessary the additional use of the open incinerator

which compounded instead of alleviating the problem. Again, in the fall of 1968 this problem was called to the attention of the present superintendent, Carl Stuart, who informed plaintiff and her husband that due to the lack of funds for the purpose he could not arrange to have the trash carried away and that because the district was unable to furnish trash disposal to all of the schools (5 in number) in Conway he could not accept the offer of the Downs to defray the cost and thereby prefer one school over another.

10. There was a committee of mothers of the second grade, comprised of 3 mothers, of which Mrs. William Saunders was Chairman. Her daughter was a pupil in Mrs. Downs class. On 2 or 3 days a week, Mrs. Saunders visited the class, observed its operation and noticed the smoke nuisance and the hazards involved. Without the knowledge of the plaintiff she and the other 2 members of the committee visited the principal and complained of the situation. Thereafter on 3 occasions they called upon the school superintendent and registered their complaints. The only explanation ever given by the superintendent to either the plaintiff, her husband, or the committee of class mothers was that he was working on the problem with the School Board, but that there was nothing he could do about it.

11. Superintendent of Schools, Carl Stuart, at the time of these complaints knew that the incinerator posed a danger to both health and the physical well-being of the students, but took absolutely no steps to eliminate the hazards.

12. In the last week of January of 1970, in the course of and pursuant to a school outline of teaching, a situation arose as follows: The authorized text and materials discussed the relative nutritional value of many foods; included in this material was the information that the nutritional properties of raw carrots exceeded those of cooked carrots. Soon after this a pupil asked whether she might write a letter to the supervisor of the lunch program of the school asking that raw carrots be served at times in place of cooked carrots. A letter of this type asking someone to help or do something to help the writer was an integral part of the suggested teaching of the students at that particular time: Plaintiff's exhibit #9 showed that the workbook (Think and Do) which accompanied their text instructed the writing of this type of letter. The idea of such a letter originated solely in the mind of one second-grade pupil (this will be discussed more fully later). Since it originated solely with the student and fit particularly well into the curriculum, the plaintiff readily acquiesced in the child's request and several letters were drafted, two of which were exhibits 10 and 10–A of plaintiff's exhibits. The plaintiff herself signed the letter upon the request of the students who had also signed the same. A student teacher who was then observing the class as part of her education to become an elementary teacher was present and also signed the letter. The letter, plaintiff's exhibit 10–A, read "Dear Mr. Glenn, The people in my room do not like cooked carrots so will you please serve the school raw carrots? Mrs. Downs Second Grade." The principal of the school, Mr. Parris, testified that he received the letter, or at least a copy thereof, but did not sign it. It was then sent in the mail to Mr. Glenn.

13. The matter came to the attention of the Superintendent of Schools, Carl Stuart and he thereupon brought it to the attention of the plaintiff, charged her with going over his head, violating school policies and for the first time brought to her attention that he took umbrage at the drawings or cartoons of the children which they had drawn during the episode of the broken water fountain. The plaintiff assured him that she had no intention of doing other than following school policies and felt that she had not violated any school policy and certainly had no intention of criticizing Carl White, the superintendent of maintenance with reference to the drawings and that she had considered the drawings to be rather creative on the part of the children and to be part of her duty to

awaken interest in children to current events. The superintendent charged her with violating school policy in connection with the drawings and in connection with the letter stating that going over his head was a reflection upon him which could not be tolerated. Despite plaintiff's protest of any intention to go over his head, he warned her not to repeat the "offense".

14. In April of 1970, the incinerator nuisance became aggravated and again the plaintiff protested and was told by the superintendent that he had had no complaints from any other teacher in this regard. He failed to inform her of the fact that the class mother's committee had vigorously protested to him of this unhealthy situation.

15. Because of the fact that the plaintiff felt that she may have been wrong in her protest, she directed personal notes to all of the teachers and asked them whether the effusions were objectionable to them. The principal on that day, April 28, 1970, had also indicated to her he would recommend her for a contract renewal. The plaintiff did write notes to each of the teachers, submitted them to the teachers and received replies from most of the teachers. One of the teachers, Geneva Bowlin, a first-grade teacher who had been out ill for some time and had returned to school did not have time or the inclination to answer whether or not the incinerator was objectionable to her. Upon the plaintiff's requesting and reminding her on one or two occasions that she had not answered it, she made a complaint to the superintendent. The superintendent testified that this occurred on April 29, 1970, and in addition stated that he had met an unknown 7 or 8 year old boy in the school yard who had stated to him that an unspecified teacher had become ill from the smoke of the incinerator and had asked the child to ask the superintendent to have the incinerator moved. As a result of the combination of circumstances, the letters (alleged by the superintendent to be petitions) and the request by the child, he determined that day not to recommend her for renewal of contract.

16. The Court finds as a fact that the statement as to the unknown boy specifying an unknown teacher is absolutely without foundation and has been used by the superintendent to justify an illegal failure of renewal of plaintiff's contract. A meeting or "hearing" was held before the School Board at Mrs. Downs request on May 5, 1970, at which the complaints of the superintendent against the plaintiff were supposed to be aired. The plaintiff offered to submit herself to questioning by the Board but no questions were asked of her. No written charges up to that time had been preferred against her but it was clear to all in attendance that the three factors and incidents above set forth in some detail were to be and actually were the sole and exclusive basis of the action of the School Board in refusing to renew the contract.

17. The plaintiff herein has had a record of 25½ years of outstanding service to the public school system of Arkansas. In fact the principal of her school under oath labeled her a "master teacher". There is not the slightest evidence that in all the 25½ years of devoted service to the children of Arkansas she ever had any other complaint registered against her, except the three by Carl Stuart.

18. At a meeting of the Ellen Smith School Parent-Teachers Association, held on April 27, 1970, the Association went on record requesting the School Board to abate the nuisance created by the incinerator and incinerators. The letter of May 25, 1970, notifying the plaintiff that her contract would not be renewed for cause contained the following three charges: This was the first written statement of charges of any kind ever furnished the plaintiff. The reasons are as follows: "(1) insubordination (2) lack of cooperation with the administration (3) teaching second graders to protest."

19. The evidence discloses as a fact that the plaintiff was never guilty of insubordination.

20. The evidence discloses as a fact that not only did the plaintiff not fail to cooperate with the administration, but that she used every reasonable means to fulfill her duties as a teacher and to comply with and follow the policies of the Board.

21. The Court finds as a fact that the plaintiff did not teach her second-grade pupils to protest the authority either of the teacher, the principal, the superintendent or the school board.

22. The Court finds as a fact that the superintendent demanded blind obedience to any directive he gave whether illegal, unconstitutional, arbitrary or capricious.

23. The Court finds that the interpretation given to the policy principles by the Superintendent Stuart went far and beyond the meaning intended by its drafters. The evidence was uncontradicted that the policy drafters intended that the policies be interpreted so as to maintain order and discipline within the classroom.

24. The Court finds that the superintendent of schools, intending to disregard every legal right of the plaintiff, and the pupils in her care, lumped three individual, unrelated, and innocent incidents into charges for the single and sole purpose of depriving the plaintiff of her legal rights under the contract of her employment and under the Constitution of the United States.

25. That the charges singly or in a group afforded no justification for failure to renew the plaintiff's contract with the School Board.

26. The Court also finds that at all times relevant Mrs. Downs stood ready, able, and willing to resume her teaching duties at the Ellen Smith School, and that she also made a sincere and diligent attempt to find like work for the 1970–71 school year and was unsuccessful in doing so.

27. That the Board's refusal to renew plaintiff's contract effectively acted as a barring of her in the Arkansas Public School System.

28. That the plaintiff, unless reinstated, will suffer irreparable damage.

## DISCUSSION AND THE LAW

■■■ This Court finds, as a matter of law, that the plaintiff, having exhausted the administrative remedies available to her, is properly in the Federal Courts. That the plaintiff having requested a hearing before the School Board, and having appeared before the same has availed herself of the entire appellate process allowed by the Arkansas educational system. In fact, she was not "entitled" to even that under the law of this Circuit, see Freeman v. Gould Special Sch. Dist. of Lincoln Co., Ark., 405 F.2d 1153, 1160 (8th C.A.1969), cert. denied, 396 U.S. 843, 90 S.Ct. 61, 24 L.Ed.2d 93.

■ The *Freeman, supra* opinion is also dispositive of the issue of whether the plaintiff is afforded constitutional procedural due process. (Plaintiff's procedural rights arising from her contract will be discussed later.) Plaintiff alleges that the hearing provided for her was unconstitutional in that she was not properly informed of the scope of the charges against her, and that the hearing, as conducted, failed to adequately air the issues. However, the 8th Circuit's holding in *Freeman, supra* which was based on an opinion of the Arkansas Attorney General dated May 10, 1967, specifically ruled that the Board is under no obligation to furnish any hearing for a teacher. Therefore, since a teacher does not have the right to require a hearing, it appears that there is also no right to demand that a hearing conform to any particular standards. This appears to be the law of the Circuit and this Court is bound by it, contra see Lucas v. Chapman, 430 F.2d 945 (5th C.A. 1970).

■ While *Freeman* defeats plaintiff's claimed denial of procedural due

344

process, it does lend vitality to her allegation of denial of substantive due process and violation of constitutional rights. The Court there ruled:

"While the school boards in Arkansas have the right to decide whom they are going to employ or re-employ, the basis for failing to re-employ must not be on impermissible constitutional grounds. Smith v. Board of Education of Morrilton School District No. 32, 365 F.2d 770 (8 Cir. 1966) (racial discrimination); Johnson v. Branch, 364 F.2d 177 (4 Cir. 1966), cert. denied 385 U.S. 1003, 87 S.Ct. 706, 17 L.Ed.2d 542 (racial discrimination); Shelton v. Tucker, supra [364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231] (a disclosure statute violative of the right of associational freedom, closely allied to freedom of speech)". 405 F.2d at 1158.

In Smith v. Board of Ed. of Morrilton Sch. Dist. #32, 365 F.2d 770 (8th C.A. 1966), the Court in discussing the near absolute freedom of school boards to hire and fire teachers, placed only one limitation on that freedom. They stated,

"Nothing contained in this opinion is intended to be restrictive of a school board's freedom to make full inquiry and to give due consideration to any applicant's qualifications and the district's needs in filling vacancies so long as the board does not act unreasonably, arbitrarily, capriciously, or unlawfully." 365 F.2d at 782.

Chief Judge Henley, of this district, in Norton v. Blaylock, 285 F.Supp. 659 (E. D.Ark.1968), aff'd 409 F.2d 772 (8th C. A.1969), ruled:

"A complaint by an individual that he has been wrongfully barred or discharged from public employment can no longer be dismissed summarily by reference to Justice Holmes's familiar statement to the effect that no man has '[a] constitutional right to be a policeman,' McAuliffe v. City of New Bedford, 155 Mass. 216, 29 N.E. 517, quoted in Birnbaum v. Trussell, 2 Cir., 371 F.2d 672, 677. It is established by now that a State may not constitutionally impose arbitrary or discriminatory employment criteria and may not in general condition public employment upon the willingness of an employee or would-be employee to forego the exercise of right protected by some of the first ten amendments to the Constitution as brought forward into the 14th Amendment. See e.g.: Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982; Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed. 2d 231; Slochower v. Board of Higher Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692; Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216, * * *" 285 F.Supp. at 662.

The determination of what constitutes impermissible, unconstitutional, unreasonable, arbitrary, capricious, or unlawful grounds has been well litigated, and the law which has developed is especially protective of the first amendment rights of both teachers and students.

The 4th Circuit in Johnson v. Branch, 364 F.2d 177 (4th C.A.1966) arises out of a similar situation in North Carolina, a jurisdiction whose laws regarding teacher tenure (or lack of it) and school board powers, are substantially identical to those of Arkansas. They found:

"The Supreme Court has recently had occasion to consider the law in this and analogous areas. It has pointed out on numerous occasions the importance of the teaching profession in our democratic society and the necessity of protecting its personal, associational and academic liberty. 'Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always be free to inquire, to study and to evaluate * * *.' Sweezy v. State of New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1212, 1 L.Ed.2d 1311 (1957); Barenblatt v. United States, 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959); Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952); Adler v. Board of Education, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952)."

They continued:

> We take it to be beyond cavil that the state may not force the plaintiff to choose between exercising her legitimate constitutional rights and her right of equality of opportunity to hold public employment. In Alston v. School Board of City of Norfolk, 112 F.2d 992 (4 Cir., 1940), cert. denied, 311 U.S. 693, 61 S.Ct. 75, 85 L.Ed. 448 (1940), this court struck down a practice of paying lesser salaries to Negro school teachers. In that case Chief Judge Parker said:
>
> "It is no answer to this today that hiring of any teacher is a matter resting in the discretion of the school authorities. Plaintiffs, as teachers qualified and subject to employment by the state, are entitled to apply for the positions and to have the discretion of the authorities exercised lawfully and without unconstitutional discrimination as to the rate of pay to be awarded them, if their applications are accepted.
>
> " * * * If a state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guaranties imbeded in the Constitution of the United States may thus be manipulated out of existence." [Citing and quoting Frost Trucking Co. v. Railroad Comm., 271 U.S. 583, 594, 46 S.Ct. 605, 70 L.Ed. 1101 (1926)] (112 F.2d at 996–997)." 364 F.2d at 180.

The leading case in this area is Tinker v. Des Moines Independent Community Sch. Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). There the Court concluded that:

> "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. This has

been the unmistakable holding of this Court for almost 50 years * * *

In West Virginia State Board of Education v. Barnette, *supra* [319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628] this Court held that under the First Amendment, the student in public school may not be compelled to salute the flag. Speaking through Mr. Justice Jackson, the Court said:

> 'The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted. These have, of course important delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.' 319 U.S., at 637 [63 S.Ct. at 1185].

The Court further determined that:

> The District Court concluded that the action of the school authorities was reasonable because it was based upon their fear of a disturbance from the wearing of the armbands. But, in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, Terminiello v. Chicago, 337 U.S. 1 [69 S.Ct. 894, 93 L.Ed. 1131] (1949); and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength

and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is finding and no showing that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained. Burnside v. Byars, *supra*, [363 F.2d] at 749." 393 U.S. at 508, 509, 89 S.Ct. at 737, 738.

It is patently clear from the evidence presented in this case, especially the testimony of the Superintendent of Schools, that association with the Conway School District, whether as teacher or pupil, constitutes a waiver of the 1st amendment, rights of free speech and freedom to peaceably petition for the redress of grievances. This waiver has been effectuated by the Superintendent through the unreasonable interpretation of School policy. The policies of the school district are printed in a looseleaf publication entitled "Policies, Rules, and Regulations of the Conway Brd. of Education" (plaintiff's exhibit #3). In chapter VI B, Specific Operational Policies, number 10 (plaintiff's exhibit #7) reads:

"10. *Petitions:* No petition for any purpose may be circulated in any building without the approval of the Superintendent of Schools."

The testimony of Mr. Robbins of the Arkansas Education Association, who had been with the Conway Schools for 15 years and was chairman of the School Policies Committee, that created the Policies in question, was that it was the clear and public intention of the aforementioned policy to prevent the disruption of in class studies by the circulation of petitions. This interpretation of that policy would be wholly in keeping with the law as laid down in *Tinker, supra*. Mr. Stuart, however, interprets that section so as to preclude any and all correspondence, requests, and petitions unless blessed by himself prior to its circulation. This amounts to total censorship. This point was specifically covered in Friedman v. Union Free School Dist. No. 1, Town of Islip, 314 F.Supp. 223 (E.D. N.Y.1970). The court pointed out that:

" * * * The Board's specious suggestion that 11F–21 (a policy similar to VI B 10) prevents all distribution in order to prevent the Board from becoming a censor is easily answered— it can accomplish the same objective by permitting all distribution, to the extent that such distribution does not materially and substantially interfere with the school's operation." 314 F. Supp. at 228 (parenthesis added). See also *Tinker, supra*, and Wolin v. Port of New York Authority, 392 F.2d 83, 90 (2nd Cir. 1968) cert. denied, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275.

In the case at bar, the superintendent used his interpretation of VI B 10 to conclude that the plaintiff violated that policy when:

(1) she allowed her student to write a letter to the cafeteria supervisor requesting raw carrots, and (2) when she showed the children's cartoons to the principal (the Court would like to reiterate at this point its finding that both the letter and cartoons were completely reasonable and in keeping with the curriculum as prescribed in the authorized texts and materials provided for the second grade by the Conway School District) and, (3) when she wrote the other teachers concerning the incinerator (this incident will be discussed in greater depth later, as the Court finds that this is the real cause of friction and that the other incidents were brought in ex post facto, to strengthen a position that the superintendent must have recognized as being extremely weak). At no time has the defense averred that any of Mrs. Downs conduct did or even could be reasonably expected to "materially and sub-

stantially interfere with the requirements of appropriate discipline in the operation of the school" *Tinker, supra,* 393 U.S. at p. 509, 89 S.Ct. at p. 738.

The Supreme Court of Arkansas in defining "cause" has stated in Williams v. Dent, 207 Ark. 440, 181 S.W.2d 29 (1944) that:

> " ' "Cause", or "sufficient cause," means "legal cause," and not any cause which the Council may think sufficient. The cause must be one which specifically relates to and affects the administration of the office, and must be restricted to something of a substantial nature directly affecting the rights and interests of the public.' And in Corpus Juris, vol. 43, § 1085, p. 658, the term 'for cause,' is said to mean *just* cause: 'And the cause assigned for removal must not be a mere whim or subterfuge, but must be of substance relating to the character, neglect of duty, or fitness of the person removed.' " 207 Ark. at 450, 181 S.W.2d at 39. See also Martin v. Cogbill, Commissioner, 214 Ark. 818, 218 S.W.2d 94 (1949).

Mr. Stuart, in his testimony took the rather paradoxical position that while he believes that freedom to discuss controversial subjects is essential to a democratic education he personally will not tolerate such. This same rationale was met in Los Angeles Teachers Union v. Los Angeles City Board of Ed., 71 Cal.2d 551, 78 Cal.Rptr. 723, 455 P.2d 827 (1969). There the Court pointed out that:

> "Harmony among public employees is undoubtedly a legitimate governmental objective as a general proposition (see Pickering v. Board of Education, 391 U.S. 563, 569–570, 88 S.Ct. 1731, 20 L.Ed.2d 811); however, as we have seen, government has no interest in preventing the sort of disharmony which inevitably results from the mere expression of controversial ideas. (Tinker v. Des Moines Independent Community Sch. Dist., 393 U.S. 503, 509, 89 S.Ct. 733, 21 L.Ed.2d 731; Terminiello v. City of Chicago, 337 U.S.

1, 4, 69 S.Ct. 894, 93 L.Ed. 1131; Wirta v. Alameda-Contra Costa Transit Dist., 68 Cal.2d 51, 61–62, 64 Cal. Rptr. 430, 434 P.2d 982.) It cannot seriously be argued that school officials may demand a teaching faculty composed either unthinking 'yes men' who will uniformly adhere to a designated side of any controversial issue or of thinking individual sworn never to share their ideas with one another for fear they may disagree and, like children, extend their disagreement to the level of general hostility and uncooperativeness. Yet is is precisely the inevitable disharmony resulting from the clash of opposing viewpoints that defendants admittedly seek to avoid in the present case." 78 Cal.Rptr. at 729, 455 P.2d at 833.

It is the creation of this type of uniformity, by suppression, that has been attempted here.

Here we have uncontradicted testimony revealing several facts concerning the key dispute between Mrs. Downs and Mr. Stuart:

1. An open unfenced incinerator, consisting of 3 brick walls in a ⌐⌐ shape was located nearly in the center of an elementary school playground. (see defendant 1).

2. Trash was burned in this incinerator throughout the school day including the times that the children were in the yard.

3. The fire was an attractive nuisance which drew children to it, and was so located as to cause children playing ball to come into inadvertent contact with it.

4. Not only was there a serious danger of a child getting burned, but there was additional danger from the refuse (broken bottles and burned tin cans) which were left around the incinerator.

5. Lastly and certainly not least, the smoke and ash created from burning such things as waxen milk cartons caused several rooms, (depending on wind conditions) to fill with enough smoke so as to

cause drowsiness and illness in some children as well as for Mrs. Downs.

Confronted with the above facts, and coupled with the Superintendent's apparent inability or refusal to remedy the situation, the plaintiff was expected to either live with the incinerator or resign.

While some state statutes provide legal immunity for negligent act by teachers and school supervisory personnel, this Court can not locate any jurisdiction that does not subscribe to the proposition that:

> "It is the duty of a teacher in the public schools to exercise proper supervision over pupils in his charge and to exercise reasonable care to prevent injury to them." 78 C.J.S. Schools and School Districts § 237 b.

Both alternatives left to plaintiff by Mr. Stuart would be violative of her moral, if not legal, duty to protect the health and safety of her students.

> "At least in a limited sense the relation of a teacher to a pupil is that of one in loco parentis. We are not here concerned with the law applicable to punishment of a pupil by a teacher; but rather with the law applicable to the duties of a teacher in the care and custody of a pupil. In the faithful discharge of such duties the teacher is bound to use reasonable care, tested in the light of the existing relationship." Gaincott v. Davis, 281 Mich. 515, 275 N.W. 229, 231 (1937). See also Segerman v. Jones, 256 Md. 109, 259 A.2d 794, 801 (1969).

Nonfeasance is as much of a breach of a teacher's duty as misfeasance Eastman v. Williams, 124 Vt. 445, 207 A.2d 146 (1965).

Aside from the moral and legal aspects of the plaintiff's duty she also was contractually bound to do the same. VII F 3 of the "Policies, Rules, and Regulations of the Conway Board of Education (plaintiff's exhibit #3) states that:

> "The total school curriculum, including the instructional program, all school facilities, and the general schedule of activities shall at all times be conducive to good health practices."

III F 4a (Major Duties and Responsibilities of a Teacher) reads:

> "He shall be responsible for carrying out to the best of his ability the policies, rules and regulations established by the Board of Education and for maintaining at all times a classroom which actively demonstrates the current philosophy of the Conway Public Schools."

These rules were part of the teachers contract and plaintiff acted reasonably and responsibly under them. (the legal contract considerations will be discussed later).

Confronted with a clear duty Mrs. Downs proceeded in strict accordance with the rules not withstanding the unconstitutionally broad rule as to petitions. At all times she complied with the Board Rule requiring that:

> "Teachers should work through proper channels. If it is at all possible, all problems should be solved by those immediately concerned. If this is not possible, the teacher will then ask help from the principal, the superintendent, the Board of Ed. in this order and only as it becomes necessary to embat the aid of a successively higher authority." (see plaintiff's exhibit #5 or plaintiff's exhibit #3, p. 5).

In the incident concerning the carrots, Mrs. Downs discussed the matter only with the cafeteria supervisor as he was the party most immediately concerned. With respect to the water fountain, again only the maintenance supervisor and later the principal were involved as it was unnecessary to enlist the aid of a successively higher authority re: the superintendent. Lastly regarding the incinerator Mrs. Downs again only went through the hierarchy as the need became evident.

At this point it should be pointed out that these events occurred over a period of 3 school years. Also, Mrs. Downs was not the only teacher to voice concern with the incinerator problems; another teacher testified that she had complained

to the principal, and was informed that it would be useless for her to go higher as the superintendent had made up his mind to do nothing.

This Court realizes that the incidents complained of here do not, at first blush, seem to raise any real threat to democracy or the constitution, but upon further examination more ominous repercussions are revealed.

A citizen, be he teacher or layman, has the legal right to seek redress be it judicial or administrative for substantial dangers and/or threats to his health and/or safety and a court cannot sanction attempts to so intimidate a citizen, that they forego such fundamental rights Edwards v. Habib, 130 U.S.App. D.C. 126, 397 F.2d 687 (1968), cert. denied, 393 U.S. 1016, 89 S.Ct. 618, 21 L. Ed.2d 560.

When a School Board acts, as it did here, to punish a teacher who seeks to protect the health and safety of herself and her pupils, the resulting intimidation can only cause a severe chilling, if not freezing, effect on the free discussion of more controversial subjects.

"The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools. 'By limiting the power of the States to interfere with freedom of speech and freedom of inquiry and freedom of association, the Fourteenth Amendment protects all persons, no matter what their calling. But, in view of the nature of the teacher's relation to the effective exercise of the rights which are safeguarded by the Bill of Rights and by the Fourteenth Amendment, inhibition of freedom of thought, and of action upon thought, in the case of teachers brings the safeguards of those amendments vividly into operation. Such unwarranted inhibition upon the free spirit of teachers * * * has an unmistakable tendency to chill that free play of the spirit which all teachers ought especially to cultivate and practice; it makes for caution and timidity in their associations by potential teachers.' Wieman v. Updegraff, 344 U.S. 183, 195 [73 S.Ct. 215, 221, 97 L.Ed. 216] (concurring opinion). 'Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate * *.' Sweezy v. New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1212, 1 L.Ed.2d 1311." Shelton v. Tucker, 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960) see also Parducci v. Rutland, 316 F.Supp. 352, 355 (M.D.Ala.1970).

At this juncture the Court would like to specifically state that the infamous allegation of "licentious conduct" on the part of the plaintiff (defendant's ans. p. 4) is totally unfounded and its use is highly defamatory; illustrative of the highly malevolent attitude of the defendants.

On the question of whether the "Policies, Rules and Regulations of the Conway Board of Education" are in fact incorporated into a teacher's contract we must look at all of the facts surrounding the contract. The contract itself (plaintiff's exhibit #1) consists of one side of paper containing the bare minimum as to salary, how it is to be paid and the school to which the teacher is assigned. No mention is made of teacher, duties, responsibility, subject or grade to be taught or administrative practices. Therefore, looking only to the face of the document the contract is clearly not indicative of the entire agreement between the parties. The further information necessary to establish a clear relationship is contained in the aforementioned Policies. In fact III F 4a, supra, indicates that the Board clearly intends to hold each teacher to the conditions set forth therein. This situation falls clearly within the facts and findings in Greene v. Howard Univ., 134 U.S.App. D.C. 81, 412 F.2d 1128 (1969) which held that the duties and obligations set forth in the teachers handbook were to be incorporated into the contract. See also Ferguson v. Thomas, 430 F.2d 852 (5th Cir. 1970).

While the plaintiff here assigns error to the alleged failure of the Board of Education to give her sufficient notice and hearing, under the provisions of dismissal spelled out in the Policies, Rules and Regulations (III F 12), the Court need not rule whether these contract provisions were procedurally met, as it has already been found that substantively the action taken by defendant was plainly unconstitutional.

In conclusion this Court hopes that the defendants herein will adopt a reasonable attitude which will allow its teachers to comply with Policy III F 4e which provides, as to teachers that:

"He shall demonstrate the principles of democracy at all times in the operation of his classroom thereby providing each child with the opportunity to develop from actual experience a real understanding of the democratic way of life."

The Board should not allow naive and chimerical fears to disrupt the above objective as was done in this case.

The caveat of Justice Peters of California in Los Angeles Teacher Union v. Los Angeles City Board of Ed., *supra*, 78 Cal.Rptr. 723, 732, 455 P.2d 827, 836 that:

" * * * Education is in a state of ferment, if not turmoil. When controversies arising from or contributing to this turbulence are brought before the courts, it is imperative that the courts carefully differentiate in treatment those who are violent and heedless of the rights of others as they assert their cause and those whose concerns are no less burning but who seek to express themselves through peaceful, orderly means. In order to discourage persons from engaging in the former type of activity, the courts must take pains to assure that the channels of peaceful communication remain open and that peaceful activity is fully protected."

must be and will be heeded by this Court.

The opinion set forth above shall constitute the complete findings of act and conclusions of law of this court as required pursuant to Rule 52 of the F.R. Civ.P.

## ORDER

And now, to wit, this 23rd day of June, 1971, it is ordered, adjudged and decreed, that:

1. the plaintiff, Mrs. Mildred Downs be reinstated to her teaching position at the Ellen Smith School, for the 1971–72 school year, and thereafter for so long as her conduct and competency comports with the standards of her profession, and the legal and reasonable policies of the Conway School System, and

2. the defendant is to compensate the plaintiff for her lost wages for the 1970–71 school year and she is to be restored to her position with the full rights, emoluments, and seniority that she would have been entitled to had her course of service not been interrupted, and

3. the defendant is assessed the full court costs and attorneys fees that have accrued as a result of this action the costs to be taxed by the Clerk and the attorney's fees to be fixed by the court upon written application.